[L. A. No. 18723. In Bank. Dec. 7, 1943.]

R. W. RISKIN et al., Petitioners, v. INDUSTRIAL ACCI-
DENT COMMISSION and A. F. MINER, Respondents.

250

Overton, Lyman & Plumb and L. K. Vermille for Petitioners.

Everett A. Corten, Fred G. Goldsworthy and Dan Murphy, Jr., for Respondents.

SCHAUER, J.—Petitioners seek the annulment of an award made by the Industrial Accident Commission in favor of one A. F. Miner for injuries which he received on April 18, 1942, while engaged in constructing a tunnel on a mine known as the Ruby Quartz Claim near Shoshone, California. The sole question presented is the sufficiency of the evidence to justify the finding of the commission that Miner was an employee of petitioners at the time he was injured, rather than, as claimed by petitioners, either an independent contractor or the employee of a fellow workman also claimed by petitioners to have been an independent contractor. We have concluded that, upon the record, the award must be affirmed.

It appears from the return to the writ of review that in March and April, 1942, petitioners were jointly engaged in mining operations at the Ruby Quartz Claim. The evidence discloses a quite informal inception, and absence of detailed articulation, of the relationship between petitioners and the claimant. Petitioner Morris, on behalf of himself and the other petitioners, told Mr. Charles Brown, the proprietor of a general store at Shoshone, who sometimes acted as an intermediary or agent for mine owners, that petitioners wanted 40 feet of tunneling done on the mine and requested that if he, Brown, knew anyone "who would take a contract to furnish everything and do the work at $7.00 a foot, to send him over to see" petitioner Riskin. Mr. Brown told Mr. Casey, an experienced miner, of Morris' request and instructed Casey

that if he wanted to do the work he should go to Ibec (about 25 miles from Shoshone) and see either Morris or Riskin. Mr. Casey then informed Miner, the applicant for compensation herein, of the offered work or contract and "asked him if he wanted to go out there and go to work. He said we will go out there and look at it." Casey, Miner, and Riskin then went to the mining property, where Riskin gave general instructions as to the direction, length, and size of bore of the tunnel, telling the workmen, among other things, to "Keep it big enough to work in" and to "drive it a little bit to the left, to hit the incline shaft." The tunnel had previously been driven 50 to 60 feet and Riskin directed that the maximum length of the extension to be dug by Casey and Miner was to be 40 feet, but that they were to stop work if they struck ore at a shorter distance. As to any contractual obligation relative to earlier termination of the work, both Miner and Casey testified in effect that it was their understanding that they could quit whenever they wished, and that petitioners could direct discontinuance of the work any time they pleased. In the words of Casey, "They could stop us or we could quit if we wanted to." Morris also testified that Casey and Miner could have quit whenever they wished although he didn't think there was "any understanding to that effect," and that in such event they "could collect for what they had done" at the rate of $7.00 per foot. (The evidence shows that they did quit, after extending the tunnel 31 feet, and before striking ore, and that they were paid at the agreed rate.)

Casey and Miner commenced work on March 28, 1942, and continued until April 18, 1942, the date Miner was injured. At that time they had completed 31 feet of tunneling, for which they were thereafter paid, as parenthetically mentioned above, at the specified rate of $7.00 per foot by Brown, who divided the money equally between them pursuant to their instructions. The agreement between Miner and Casey was to "just go fifty fifty"; they both testified they were "partners" on the job. Money to pay for the whole 40 feet of tunneling had been deposited with Brown by Morris.

The two workmen had no mining tools or equipment, but were instructed by Riskin to use tools and equipment which were at the site of a neighboring mine and which belonged to another mining venture in which Riskin was a partner.

In this connection, Miner testified that he did not understand that he and Casey were to furnish their own tools, although they were required to and did furnish their own transportation and haul in their own water. They also understood that they were required to, and they did, furnish the powder, fuse, and caps which they used in performing their work.

Apparently little, if any, supervision was exercised over the men at their work. Casey testified that Riskin visited the mine once while they were there, but that he said "nothing particular, only something about the work, probably; how the formation was and the ground, and how we ought to hit the ore in eight or ten feet, some remarks like that. Q. He said he thought you ought to get ore within eight or ten feet? A. Some remarks—a remark a man will make in a tunnel, around works like that. Q. Did he tell you how to drill the holes? A. No, sir. Q. Did he tell you how to do the work? A. Just give us the directions of the tunnel. Q. Then you did the rest. A. Did the rest. Just follow the course the tunnel was going and bear it off a little one way or the other, I think to the left, or right, I don't remember." Miner testified that he was not present at any time Riskin was at the mine after work had commenced, but that Riskin told him that he, Riskin, had been over to the mine the "second Sunday" and had measured the work so far completed. Miner further testified that he and Casey "were all alone there at the mine doing the work," and that nobody told them how to use the tools on the property. Riskin denied visiting the mine at any time the men were working, but testified that on a Sunday during the period between March 28 and April 18 he "went up to my silver mine, which is the adjoining mine . . . and the boys weren't there." Riskin also denied knowing the rate at which the men were to be paid, although Casey testified that on the occasion when Riskin had taken him and Miner to the mine to direct them as to the work they were to do. Riskin had "told us the proposition, what it was . . . the exact words I couldn't tell you, but it was to be $7.00 a foot for driving this tunnel . . . we told him we would take it, at that price." The men worked such hours as they chose, but averaged seven to eight hours a day and took Sundays off.

It further appears that the method of payment and the amount of supervision customarily exercised over miners doing the type of work here involved vary. Miner testified that he had been engaged in mining "off and on since 1904";

that it is not customary for the foreman or the employer to constantly supervise the work; that "they give you general instructions and you go ahead with it. . . . I work week in and week out and never see bosses"; that on this job general directions were sufficient to enable him and Casey to do the tunneling. Both Miner and Casey testified that it was customary to pay for this type of work either by day or by foot, but usually the latter method was employed. Mr. Brown, who, it appears, was acquainted with mining customs in the vicinity, testified that "on large mines they let contracts, they generally guarantee on so much a foot—I mean guarantee on so much a day, or the work is very closely supervised on contracts. That is around little larger properties. There is no set rule that I can see." When questioned as to whether petitioners "would have a right" to "come out and supervise the work" of Casey and Miner, Brown stated, "Well, it was on their property. I imagine they could have a right to go and see whether the tunnel was a proper size or something like that, or running the right direction."

█ The rules for determining whether one rendering service to an employer is an employee or an independent contractor may be summarized as follows: An independent contractor is one who renders service in the course of an independent employment or occupation, following his employer's desires only in the results of the work, and not the means whereby it is to be accomplished, whereas the relationship of employer and employee exists whenever the employer retains the right to control or direct how the work shall be done as well as the result to be accomplished. █ One means of ascertaining whether or not the right to control exists is the determination of whether, if instructions were given, they would have to be obeyed. █ A strong factor tending to show the relationship of an employee is the employer's right to terminate the work at his pleasure. █ Neither the manner of payment nor the choosing by the employee of his own hours of work is conclusive of the relationship. (See *Burlingham* v. *Gray* (1943), 22 Cal.2d 87, 99-100 [137 P.2d 9].) █ The right to immediately discharge involves the right of control. (*Hillen* v. *Industrial Acc. Com.* (1926), 199 Cal. 577, 582 [250 P. 570].) █ "Where there is shown no express agreement as to the right of the claimed employer to control the mode and manner of doing the work, the existence or

nonexistence of the right must be determined by reasonable inferences drawn from the circumstances shown,'' and is a question of mixed law and fact to be resolved initially by the commission. (See *Burlingham* v. *Gray, supra,* at pp. 99-100; *Hillen* v. *Industrial Acc. Com., supra,* at p. 580; *Murray* v. *Industrial Acc. Com.* (1932), 216 Cal. 340, 345 [14 P.2d 301].) Relative to the right of a workman to discontinue his services it was stated in *Los Flores S. Dist.* v. *Industrial Acc. Com.* (1936), 13 Cal.App.2d 180, 183 [56 P.2d 581], that ''An employee may quit, but an independent contractor is legally obligated to complete his contract.''

▮ As to our approach to the factual questions on review, the rule was recently stated as follows: ''Where there is substantial evidence to support the findings and order of the commission, the reviewing court may not substitute its views for those of the commission and annul the award. [Citation.]

▮ If the findings of the Industrial Accident Commission are supported by inferences which may fairly be drawn from evidence, even though the evidence is susceptible of opposing inferences, the reviewing court will not disturb the award. [Citation.]'' (*Pacific Lbr. Co.* v. *Industrial Acc. Com.* (1943), 22 Cal.2d 410, 422-423 [139 P.2d 892].) It is also to be observed that the burden of proof rested upon the petitioners to establish that the claimant was an independent contractor (or employee of an independent contractor) as distinguished from an employee of the petitioners. (Lab. Code, sec. 5705(a); see also *Murray* v. *Industrial Acc. Com.* (1932), *supra,* 216 Cal. 340, 345.)

▮ Applying the above defined tests and rules to the evidence here, it is apparent that the commission could reasonably infer that petitioners had both the right to give special instructions to Miner and Casey, and the power to require obedience thereto, since, as is not disputed, petitioners could have terminated the work at their pleasure. Petitioners' contention that Miner, if not himself an independent contractor, was the employee of Casey rather than of petitioners, is defeated, under the circumstances shown, by section 3360 of the Labor Code, which provides that ''Workmen associating themselves under a partnership agreement, the principal purpose of which is the performance of the labor on a particular piece of work are employees of the person having such work executed. . . .'' We are of the view that the above epitomized evidence is not as a matter of law insufficient to sup-

port the findings and order of the commission, and hence that the award must be affirmed.

Petitioners, in support of their contention that upon the evidence here the commission was bound to find that Miner and Casey were independent contractors, have cited, among others, the following cases: *Donlon Bros.* v. *Industrial Acc. Com.* (1916), 173 Cal. 250 [159 P. 715]; *Fidelity & Deposit Co.* v. *Brush* (1917), 176 Cal. 448 [168 P. 890]; and *Parsons* v. *Industrial Acc. Com.* (1918), 178 Cal. 394 [173 P. 585].

 Generally speaking, it is a question of fact to be determined by the commission in each case, from the evidence therein adduced, whether the employee relationship exists. When the commission has found that the essential relationship does exist, our inquiry upon review, as to that point, extends no further than to ascertain, *in conformity with the rules hereinabove summarized,* whether the commission's finding is supported by substantial evidence. In the Donlon case, *supra,* the following factual statement appears (at p. 252 of 173 Cal.): "The deceased furnished his own working tools; he was a free agent as to his hours of labor, but *he could be discharged at any time.*" (Italics added.) Upon that factual situation the holding that the decedent was, as a matter of law, an independent contractor, is inconsistent with the rules we have hereinabove enunciated and it must be, and is, overruled. Likewise overruled are the similar holdings upon like factual statements in *Fidelity & Deposit Co.* v. *Brush* (1917), *supra,* 176 Cal. 448, 449, and in *Parsons* v. *Industrial Acc. Com.* (1918), *supra,* 178 Cal. 394, 396.

The cases of *Roberts* v. *Industrial Acc. Com.* (1921), 52 Cal.App. 31 [197 P. 978]; *Valente* v. *Industrial Acc. Com.* (1924), 68 Cal.App. 151 [228 P. 667]; *Provensano* v. *Division of Indus. Accidents* (1930), 110 Cal.App. 239 [294 P. 71]; *Winther* v. *Industrial Acc. Com.* (1936), 16 Cal.App.2d 131 [60 P.2d 342], and *State Comp. Ins. Fund* v. *Industrial Acc. Com.* (1941), 46 Cal.App.2d 526 [116 P.2d 173], are also cited by petitioners on the same proposition but all of them are distinguishable upon their respective facts to the extent that they cannot be said to be authoritative upon the precise point under discussion. In the Winther case there was a contract to pick "the entire crop of olives" and it does not appear that the employer had the right to terminate the agreement with the contractor short of its complete perform-

ance. The Valente case opinion makes no direct statement relative to the right of the employer to interrupt the work but as it is predicated solely on the Donlon case, the Fidelity & Deposit Co. case, and the Parsons case, which are overruled herein, it can no longer be regarded as an authority. In none of the other cases of the group last above mentioned does it appear that the employer had the right to terminate the work at his pleasure.

The award is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., Carter, J., and Traynor, J., concurred.