[Civ. No. 19833. First Dist., Div. One. Oct. 3, 1961.]

STATE OF CALIFORNIA, SUBSEQUENT INJURIES FUND, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, MARINO CORSINOTTI, an Incompetent Person, etc., et al., Respondents.

Stanley Mosk, Attorney General, B. Franklin Walker and C. Gordon Taylor, Deputy Attorneys General, for Petitioner.

Everett A. Corten, Robert A. Borgen and Thomas M. Mulvihill for Respondents.

TOBRINER, J.—Despite petitioner's assertion that Aid Retarded Children, Inc. merely simulated an employment relationship with the present participant in its program to train him to act as a future employee, there were enough elements of the real relation here to sustain the Industrial Accident Commission's finding that such employment existed. Nor does Labor Code section 3352, subdivision (c), preclude applicant's recovery on the ground that he performed services in return for aid from a charitable organization; applicant occupied the status of an employee rather than that of a mere donee of charity. Finally, applicant's prior imbecility did not exclude the possibility of a later partial disability; the abstraction that imbecility constitutes "total disability" does not negate the possibility that the applicant may not still suffer further disability.

As a result of a childhood illness, Corsinotti, the applicant, physically a 22-year-old adult, possessed the mentality of a child between 4 and 7 years. He lived at home with his parents and older brother and there performed some minor household chores. He was not employable on the open labor market. He performed manual tasks with gross clumsiness; he was best suited to activities involving large arm movements performed under supervision. At the time of the accident he attended the Sheltered Workshop of Aid Retarded Children, Inc. (hereinafter designated "ARC").

ARC, according to its articles of incorporation, seeks " [t]o assist in the promotion of adequate social and recreational activities, entertainment, and cultural advantages for children and adults who cannot compete on equal terms with other individuals because of mental subnormality and to provide these mentally handicapped people the opportunity to live useful and beneficial lives. . . ." ARC conducted a Sheltered Workshop program, staffed at the time of the accident by a director, a secretary and a group of voluntary workers composed of the parents of retarded children. The program consisted of the sorting of old newspapers for sale to florists, van and storage companies and other purchasers. Corsinotti engaged in this activity, and earned a small income. All participants in the program, however, paid a fee of $15 per month as tuition.

Corsinotti's duties included the tying of bundles with a string. In using a knife to cut the string he struck his right eye, and ultimately suffered the enucleation of the eye. Corsinotti filed an application for workmen's compensation benefits; he sought benefits provided by Labor Code section 4751, and alleged that at the time of the injury he suffered from a preexisting permanent disability: "permanent mental disturbance and condition of incompetency." The commission ordered that "State of California, Subsequent Injuries Fund be joined as a party defendant. . . ." When the commission awarded a permanent disability payable by the Fund, it petitioned the commission for reconsideration. The commission denied the petition; petitioner here seeks a writ of review to vacate that order.

The issues take a triple form: (1) Is the commission's finding of an employment relationship between Corsinotti and ARC supported by substantial evidence; (2) does Labor Code section 3352, subdivision (c), exclude Corsinotti from any benefits; and (3) does Corsinotti's prior imbecility foreclose any finding by the commission that he suffered a permanent partial disability?

Our first problem as to ARC's alleged employment of Corsinotti frames a narrow question. We must decide only whether substantial evidence corroborates the commission's declaration "that the evidence . . . supports a finding that an employment relationship was created within the meaning of the Labor Code. . . ." Since the presence of the employment relation constitutes a question of fact (*Riskin* v. *Industrial Acc. Com.* (1943), 23 Cal.2d 248, 255 [144 P.2d 16]), we should not disturb the commission's finding if it is supported by substantial evidence. (*S. A. Gerrard Co.* v. *Industrial Acc. Com.* (1941), 17 Cal.2d 411, 414 [110 P.2d 377].) As the court states in *Coborn* v. *Industrial Acc. Com.* (1948), 31 Cal.2d 713 [192 P.2d 959], "[t]he first duty of the court is to search the record to discover whether the evidence is reasonably susceptible to the inferences drawn by the commission in support of its conclusion, and upon favorable discovery to affirm the award. [Citation.]" (P. 717.)

 Petitioner contends that the alleged employment relation constituted nothing more than the false façade of such an association and that behind it in the place of a structure there was only emptiness. The agency, they say, as a

matter of therapy, set up a simulated employment relation to prepare the trainees for ultimate entrance into the labor market. ARC did not, they argue, actually intend to make Corsinotti an employee.

Does not petitioner, however, confuse motivation with intention? The agency would not deny that it sought to train the participants to function in the employment relationship so that they eventually could accommodate themselves to commercial employment. But that motive found accomplishment in an expressed intentional employee-employer relation. Margaret Connolly, the Executive Secretary of ARC, testified that the relation existed and that it was no mere form of occupational therapy.

The relationship exhibited the classic symbols of employment: Corsinotti received compensation on a piece-rate basis for work performed, earning about $2.50 per week; he conformed to regular hours from 9 a. m. to 5 p. m.; he had a one-hour lunch period; he worked five days per week; his wages were reduced for lateness or absence; his activities were controlled and supervised by ARC; he could quit or be discharged at any time. Indeed, the workshop sold the sorted and bundled paper at a profit for $32.50 for each ton delivered.

These indicia of employment, buttressed by the expressed intent to employ Corsinotti support the commission's determination. The cases have recognized that the control of the employee, the right to discharge, the payment of wages, and the other factors of employment above described, evidence the relationship. These criteria certainly support an inference of its existence; we cannot, then, upset the attacked but confirmed finding of the commission. ▮ " 'If the findings of the Industrial Accident Commission are supported by inferences which may fairly be drawn from evidence, even though the evidence is susceptible of opposing inferences, the reviewing court will not disturb the award. [Citation.]' " (*Riskin* v. *Industrial Acc. Com., supra,* 23 Cal.2d 248, 254.)

Petitioner contends that Labor Code section 3352, subdivision (c), formerly section 3352, subdivision (d), forecloses Corsinotti because it excludes from benefits "[a]ny person performing services in return for aid or sustenance only, received from any religious, charitable or relief organization." Respondent commission offers two answers to this contention: first, that Corsinotti did not perform "services in return for aid or sustenance only," and, second, that even if he were

so excluded, ARC had elected to cover him under workmen's compensation. We shall point out why we believe we should accept the commission's conclusions.

Petitioner's argument that Labor Code section 3352, subdivision (c), blocks the applicant rests upon the claimed pertinence of *Hartford Acc. & Indem. Co.* v. *Industrial Acc. Com.* (1934), 139 Cal.App.2d 632 [33 P.2d 686], which in turn cites *McBurney* v. *Industrial Acc. Com.* (1934), 220 Cal. 124 [30 P.2d 414]. We do not think these decisions, however, resolve the issue.

*Hartford* presents a case of performance of services in payment for specific aid rendered; our case, as we have pointed out, involves performance of services as an employee. In *Hartford,* the ''Volunteers of America,'' ''bestowed charity, sometimes in cash but more generally in merchandize, upon assumedly worthy individuals.'' (P. 633.) It sold for cash to the public certain '' 'rehabilitated' '' shoes and other articles. (P. 633.) The worker applied ''for material assistance in the way of certain articles of clothing which he desired.'' (P. 634.) Pursuant to its usual custom the charity set the worker ''to work . . . at miscellaneous small jobs, such as sweeping the premises, bundling papers, sorting clothing, etc., which occupied his time for a period of approximately two days.'' (P. 634.) Compensated at a figure of 25 cents per hour, the worker ''received the articles of clothing for which he had applied. . . .'' (P. 634.) Because the applicant performed the services in return for the clothing, the District Court reversed the commission's ruling imposing upon the charity liability under the act. Such a charitable organization, said the court, ''should not be so taxed, in favor of persons receiving charitable aid or relief, even though they render some service in return therefor.'' (P. 641.) The decision issues from the rendition of the services as direct compensation for the aid in the absence of a true employment relationship.

In contrast to the situation in *Hartford,* Corsinotti in the instant case did not perform services as payment for articles of clothing or particular aid; he occupied the status of a regular employee. His services were continuous; he performed tasks which were not related to the procurement of any specific article. The extended period of Corsinotti's employment contrasts with the two days of the worker's employment in *Hartford*; that factor in itself distinguishes the cases.

(See *Empire Star Mines Co.* v. *California Emp. Com.* (1946), 28 Cal.2d 33, 43 [168 P.2d 686]; *Perguica* v. *Industrial Acc. Com.* (1947), 29 Cal.2d 857, 860 [179 P.2d 812].) Moreover, as we have pointed out, Margaret Connolly, the Executive Secretary of ARC, testified that Corsinotti worked as an employee, not as the donee of charitable aid.

Nor does *McBurney* apply to the instant situation. There, the statute, providing for relief to the injured employee, required payment to the worker whether or not he worked for the county. He did not, therefore, assume the status of an employee.

The nature of Corsinotti's relation with ARC differentiates our case from the cited ones and precludes the application of Labor Code section 3352, subdivision (c).

█ Even if Corsinotti were an excluded employee, however, ARC could still elect to cover him by the statutory provisions for workmen's compensation. We recognize that the testimony as to such election is in conflict. Nevertheless, as we shall point out, since some substantial evidence sustains the holding of the commission, we are constrained to affirm it.

Labor Code section 4150 provides that an employer and employee may "by their joint election" place the otherwise nonqualified person under the "compensation provisions." Section 4151, subdivision (a), fixes as one method of such an election "insuring against liability for compensation. . . ."

The testimony which supports the commission, contained in the report of the referee covering the hearing of May 20, 1958, indicates that ARC insured Corsinotti. The report states that Margaret Connolly, Executive Secretary, explained that the policy's classification of employees in referring to "All other employees," "was intended" in such "schedule of others" "to include the trainees. . . ." Likewise, the referee reports "[i]t was her intent and assumption to cover the trainees." Finally the referee states that the figure of $450 to cover such employees "was a pure guess, and actually their pay came to more."

Contrasting testimony emanates from the insurance broker, a Mr. Carroll. Although a Mr. Vernon of ARC, and not Mrs. Connolly, negotiated the contract with Carroll, Vernon did not testify. Carroll, however, testified that Mrs. Connolly did not request that the insurance program cover participants; that the premiums were based upon a payroll which omitted them. The probative value of Carroll's statement as

to Mrs. Connolly's requests is mitigated, however, by the fact that she did not negotiate the contract with him.

A further direct conflict in the evidence develops as to the inclusion of the participant's wages in the payrolls upon which premiums actually were calculated. Carroll states that no information on the payroll pertained to participants. Respondent commission, however, points to evidence that the insurer's auditors calculated the premium upon a payroll which included such amounts paid to participants. Petitioner, on the other hand, contends that no inference can be drawn as to the "All other Employees" figure of $1,147 and that it could have covered the amount paid a summer camp counselor and part-time janitor.

These discrepancies in the record do not present issues for our determination. Nor are the commission's conclusions, derived from them, matters for our review. Substantial evidence supports the commission's findings; we are not authorized to disturb them. (*Douglas Aircraft, Inc.* v. *Industrial Acc. Com.* (1957), 47 Cal.2d 903 [306 P.2d 425]; *Gonzales* v. *Industrial Acc. Com.* (1958), 50 Cal.2d 360 [325 P.2d 993].)

Petitioner lastly argues that Corsinotti's incurable imbecility, which Labor Code section 4662 conclusively presumes to constitute "total disability," must necessarily preclude recovery under Labor Code section 4751, which predicates liability upon partial disability. Yet the allegedly totally disabled Corsinotti retained some capability of working; he did, indeed, wrap the bundles, and no one could foretell with certainty that such capacity would not eventually result in monetary earnings. The verbal nicety of the concept that the totality must include the parts should not obscure the underlying reality. The reality of the potential earning power punctures the fiction of the presumed total incapacity.

*Smith* v. *Industrial Acc. Com.* (1955), 44 Cal.2d 364 [282 P.2d 64], shows that a worker whose disability is rated at 100 per cent may still be entitled to benefits from the Fund. There the Fund urged the 100 per cent disability as a bar to its liability for a subsequent injury resulting in a 5¼ per cent permanent disability rating. The unanimous court held that the words "permanently partially disabled" should be liberally interpreted and that it would "penetrate the fiction of 100 per cent disability and accept the truth of his remaining earning ability so that the further truth of a subsequent injury with increased actual disability may be compensated

from the fund set up for that purpose." (P. 370.) We believe such reasoning applicable here.

We have concluded as to the main issue raised in this case that a charitable organization may establish a bona fide employment relation with a participant in its aid program and that the record substantiates the commission's finding that the organization created such a relation here.

We affirm the award.

Bray, P. J., and Duniway, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied November 29, 1961.