[S. F. No. 21771. In Bank. Dec. 14, 1964.]

REGINALD J. QUINTAL, a Minor, etc., et al., Plaintiffs and Appellants, v. LAUREL GROVE HOSPITAL et al., Defendants and Respondents.

Jeremiah F. O'Neill, Jr., George W. Hauer and Robert A. Kaiser for Plaintiffs and Appellants.

Hardin, Fletcher, Cook & Hayes, Cyril Viadro, Peart, Baraty & Hassard, George A. Smith, Joseph F. Rankin and Richard G. Logan for Defendants and Respondents.

PETERS, J.—Plaintiffs appeal from judgments notwithstanding the verdicts, and from alternative orders granting all defendants a new trial. In our opinion the judgments notwithstanding the verdicts must be reversed, and the orders granting a new trial must be affirmed.

The case revolves around the tragic experiences of plaintiff, Reginald Quintal (Reggie), who, in July of 1960, when the events here involved occurred, was 6 years of age. Prior to July 11, 1960, Reggie was a normal, healthy child, suffering only from an inward deviation of the eyes. On July 10, 1960, he entered the defendant hospital for the purpose of having this condition corrected by a minor operation to be performed on July 11, 1960, by defendant Dr. Palmberg. On the morning of that day, during the course of the administration of the anesthetic by defendant Dr. Thornburg, Reggie suffered a cardiac arrest. He was resuscitated by means of an open chest heart massage. As a result of his brain being deprived of oxygen during the period his heart was stopped, he suffered severe brain damage resulting in his becoming a spastic quadriplegic, blind and mute. Reggie, through his guardian *ad litem,* his mother, brought this action against the two doctors and the hospital for malpractice. His mother

sued for general and special damages. The jury returned verdicts against all three defendants and in favor of Reggie for $400,000, the precise amount prayed for in the complaint, and in favor of the mother for her special damages of $3,610.73. The trial court had denied motions for nonsuits and for directed verdicts, but granted the motions of all of the defendants for judgments notwithstanding the verdicts, and in the alternative, awarded all defendants, by an appropriate written order, a new trial on the grounds of excessive damages, insufficiency of the evidence, and that the verdicts were against the law.

The facts are as follows: In 1960, Reggie was suffering from some inward deviation of the eyes, but otherwise was normal and healthy. On May 8, 1960, he was taken to Laurel Grove Hospital in Castro Valley for an operation aimed at correcting the eye condition. The operation was performed by defendant Dr. Palmberg, an ophthalmologist, and was completed without incident. The anesthesiologist at that first operation is not a party to this case. He was an associate of defendant Dr. Thornburg. The first operation was not entirely successful in curing the deviation, and, after conservative treatment failed to cure the condition, it was decided that another operation was necessary. On July 10, 1960, Reggie was again taken to the Laurel Grove Hospital for an operation scheduled for the next morning, and estimated to take 20 minutes. Dr. Palmberg was to do the eye surgery, and Dr. Thornburg was to administer the anesthetic. The evening Reggie entered the hospital he was crying, with a running nose, was quite apprehensive, and was uncooperative. The medical record in fact shows that just before surgery he was "very apprehensive" and "very agitated." He had a temperature when he first arrived at the hospital, which increased up to midnight. The hospital records purport to show that his temperature, just before the operation, was a little under normal, but by expert testimony it was shown that there had been a correction and erasure in that record, and what the original record showed does not appear. The erasure was not explained by defendants. The records also show that it was therein noted that the preoperative medication aimed at sedating the patient was "unsatisfactory."

When Dr. Palmberg entered the operating room Reggie was already there, and Dr. Thornburg was administering the anesthetic in a normal fashion. Dr. Palmberg took no

part in administering the anesthetic, but remained in the room some distance from the operating table talking to an assistant about the intended operation.

During the administration of the anesthetic, and before the process had been entirely completed, Reggie suffered a respiratory arrest followed by a cardiac arrest. This means that his breathing and heart stopped. This, of course, cut off blood and oxygen to his brain. The record shows that the brain, without damage, may be without oxygen for not more than three minutes, but that every second over the three-minute limit endangers the patient and makes brain damage more probable.

When the respiratory and cardiac arrests occurred, Dr. Thornburg called out that Reggie's heart had stopped beating. Dr. Palmberg and his assistant rushed toward the table. Dr. Thornburg let the anesthetic gases out of the anesthetic bag, filled the bag with pure oxygen, pumped the bag with one hand and with the other attempted to restore Reggie's heart action by external massage. This process was continued for 20 or 30 seconds and was then stopped to ascertain if the boy's heart had started. It had not. The process was repeated for another 20 to 30 seconds, but without success. Dr. Thornburg then asked Dr. Palmberg to open Reggie's chest in order to administer manual massage to the heart. Dr. Thornburg emphasized that this operation had to be done very quickly. Dr. Palmberg stated that he did not feel qualified to perform such an operation, and started to leave the operating room to get help. Just near the door to the operating room he encountered Dr. Beumer, a surgeon. Dr. Beumer, at Dr. Palmberg's request, entered the operating room, was quickly gloved, and was handed a scalpel. He opened Reggie's chest and began heart massage. The heart responded almost immediately, and began once again to beat. The beat at first was uneven and it was twice necessary to use a defibrillator (an instrument that gives electric shocks to the heart) to correct the defective heart action. Although the evidence is confusing and somewhat in conflict, that most favorable to appellants is that about four minutes elapsed between the time Dr. Thornburg first noticed that the heart had stopped and the time the heart was again started by means of the open heart massage. Sometime after the operation it was discovered that as a result of brain damage Reggie was a spastic quadriplegic

and was both blind and mute. The condition appears to be permanent.

The plaintiffs' counsel, on the question of the propriety of the procedures employed, did not produce any independent expert witnesses, but relied on the cross-examination of the two respondent doctors, called under the provisions of section 2055 of the Code of Civil Procedure, and upon the cross-examination of the defendants' expert witnesses. The trial judge refused to instruct on the doctrine of res ipsa loquitur, but, after denying motions for nonsuits and directed verdicts, submitted the case to the jury on the basic question of whether the evidence showed that any or all of the defendants were guilty of negligence proximately causing the injuries. Proper instructions on the use of circumstantial evidence were given. The jury brought in the verdicts above mentioned. The court thereafter granted the motions of all of the defendants for judgments notwithstanding the verdicts, and in the alternative granted defendants' motion for a new trial.

*The propriety of the judgments notwithstanding the verdicts.*

These must be considered, of course, as to each defendant separately, although many of the facts are pertinent to two or more of the defendants.

■ The rules applicable to judgments notwithstanding the verdict for defendant are well settled and are agreed to by all the parties. Such a motion may be granted, properly, only when, disregarding the conflicting evidence, and indulging in every legitimate inference in favor of the plaintiff, the result is a determination that there is no evidence of substantial nature to support the verdict. ■ The trial court, on such motion, is not permitted to weigh the evidence, and on an appeal from the judgment entered on the granting of such a motion, the appellate court must read the record in the light most advantageous to the plaintiff, resolve all conflicts in his favor, and give him the benefit of all reasonable inferences in support of the judgment.

*The propriety of the judgments notwithstanding as to Dr. Palmberg and Dr. Thornburg.*

■ Both of these defendants are highly qualified and competent specialists. Dr. Thornburg is an American board certified anesthesiologist, and Dr. Palmberg is an American board certified ophthalmologist. They are, of course, held to that standard of learning and skill normally possessed

by such specialists in the same or similar locality under the same or similar circumstances. The question involved is whether there is any evidence in the record to show, or from which it may reasonably be inferred, that either doctor, or both, failed to meet the standard involved. In our opinion the evidence, independently of any possible application of the doctrine of res ipsa loquitur, is sufficient to support a verdict against the two doctors.

■ There was evidence that Reggie's cardiac arrest was caused by "vagal stimulation," that is stimulation of the vagus nerve, a basic nerve involved in the beating of the heart. Cardiac arrest is a known and calculated risk in the giving of a general anesthetic. The statistics produced as to its frequency are highly conflicting. Certainly it can be said that it occurs rarely but constantly. It can be caused by negligence. Thus it can be caused by an improper mixture of the anesthetic, by careless intubation, by giving the anesthetic while the patient has some infection, by an improper mixture of oxygen during anesthesia and by several other causes. It can also result where there is no negligence on the part of the doctors. Thus, it can result from cardiac disease, from unknown and hidden idiosyncrasies of the body, from an upset in the electrolyte balance of the body, and from other unknown causes. In the present case although the cause—vagal stimulation—was known, the cause of such stimulation was unknown. No expert testified, directly, as to the cause of the cardiac arrest suffered by Reggie.

While there was no direct testimony that the most likely cause of the vagal stimulation was negligence, there was evidence to the effect that if due care is used a cardiac arrest does not ordinarily, but can, occur. Defendants testified that several of the unknown causes were not here present, but their credibility in this respect was for the jury. Dr. Cullen, president of the American Board of Anesthesiology and chairman of the Department of Anesthesiology of the University of California, opined that 90 per cent of the deaths occurring in patients under anesthesia were due to improper management of the airway. The hospital reports, available to both doctors, showed, without explanation, that the preoperative medication used in May had been more than doubled in July; that when the boy arrived at the hospital he was apprehensive, uncooperative, crying and agitated. The records disclosed that on the morning of the operation

the boy was "very apprehensive" and "very agitated" and that the preoperative medication had been "unsatisfactory." The records also show that after his admission to the hospital on the 10th he had a rising temperature until at least midnight. The records also purport to show that the next morning the temperature was below normal, but there is expert testimony that this record had been altered, and it may be that the erased record showed a rising temperature. Both apprehension and the rising temperature are danger signals. Dr. Thornburg testified that any rise in temperature would cause the doctor to investigate; that fever is usually an indication of infection that might stimulate the vagus nerve; that if a rise in temperature was caused by an infection the patient should not be submitted to anesthesia until the symptoms had been alleviated, preferably for about 72 hours. In that connection it must be remembered that this was an elective and not an emergency surgery, in that there was no medical necessity for it to be performed at any particular time. Apprehension is also an important factor. Apprehension is an emotional state or reaction, and causes adrenaline to be pumped into the circulatory system. This increases the sensitivity of the heart. This can cause a reaction to the vagus nerve in that it can cause an increase in blood pressure and an increase in the pulse rate. Thus, in the present case we have fever, and we have apprehension. Either were danger signals. It is true that the doctors involved testified that they considered such factors and for various reasons found them not convincing, but the veracity of such testimony from interested witnesses was for the jury.

All of these factors apply to both doctors, both of whom knew the facts, had access to the records, and either could have called off the operation if he believed it would be dangerous.

There is another important factor relating to negligence on the part of Dr. Palmberg. It will be remembered that when Dr. Thornburg asked him to open the boy's chest, emphasizing that time was essential, he stated that he did not feel competent to do so and sought someone that was. He rushed to the door of the operating room and found Dr. Beumer. Dr. Beumer came into the room, was gloved, was handed a scalpel, and then opened Reggie's chest. Although a surgeon, he had never before performed such an operation.

There was much relevant testimony on the problems presented by this evidence. Various experts stated that car-

diac arrest was a known risk in all general anesthesia cases, and Dr. Palmberg admitted that he knew that this was so. Open chest surgery, in 1960, was the normal way of handling such a problem, if external massage was not successful. Dr. Palmberg knew that this was so. The medical profession, generally, was quite concerned about this problem. In Alameda County, the medical association furnished lecturers, movies and demonstrations on this problem and how it should be handled, not only to the members of the general association, but to the specialist groups such as the ophthalmologists. Plaques, with directions as to how to handle the emergency, were placed in each operating room in the county. Dr. Palmberg admitted knowing that time was of the essence in such cases, and that every second over three minutes that the brain was deprived of oxygen increased the danger of permanent brain damage. Although the times involved in the instant case cannot be determined with precision, there is substantial evidence that Reggie's heart was stopped for four minutes before Dr. Beumer was successful in starting it. Just how many seconds were consumed after Dr. Palmberg announced that he did not feel competent to perform the operation, then rushed to the door, found Dr. Beumer, brought him into the operating room, had him gloved, and handed a scalpel so the operation could proceed, does not accurately appear in the record. It is a reasonable inference that most of a minute was so consumed, certainly at least 30 to 45 seconds. These were the dangerous seconds. It can be inferred that they were the brain damaging seconds.

Under such facts, two questions immediately arise. Would reasonable prudence have required that Dr. Palmberg, although an ophthalmologist, a surgeon, but a specialist, possess the skill to perform such a relatively simple operation? He was required to take and did take general surgery courses in medical school. If Dr. Palmberg did not possess such skill, does not reasonable care require that such a surgeon see to it that a competent surgeon is immediately in attendance to meet this emergency if it should arise? Because of the known time limits involved, by ''immediately'' available is meant not in the hospital, but in the operating room itself. These are difficult questions. It is arguable that the standard of due care involved in this respect does not require expert evidence, that is, that the required standard of care is so clear that it is a matter that the jury could decide without expert evidence. However, it is unnecessary to rely

on common knowledge in this case because there is expert testimony from which the jury could infer that the proper standard of due care required Dr. Palmberg to perform the operation, or if not, to have had someone immediately available who could perform it.

It is true that there is expert evidence from the defendants and from their witnesses that the standard of care then prevalent in Alameda County did not require that an ophthalmologist be competent to perform a thoracotomy. But there is other expert evidence from these very same witnesses that would support an inference to the contrary. All the witnesses admitted that the possibility of a cardiac arrest was a known risk. All admitted that the operating surgeon, regardless of his sepecialty, should be prepared in some way. Dr. Dugan, a thoracic surgeon, although he testified he did not believe an ordinary ophthalmologist was qualified to open a chest, and that if he were the patient he would take the fellow in the hall, even if to get him consumed 30 seconds, rather than have an unqualified man open his chest, admitted on cross-examination that "Anybody, any surgeon who is operating in a hospital, I will admit and agree, in dire circumstances should be able to do an open chest operation." Certainly, the circumstances here involved were "dire," and every second was precious. The fact that Dr. Beumer was available as quickly as he was was a coincidence and not a planned procedure. Thus the jury could have inferred from the testimony that either Dr. Palmberg should have performed the thoracotomy, or should have taken steps to have someone present to do so.

Thus the evidence, while circumstantial, was sufficient to go to the jury on the question of the two doctors' negligence. This is so without any reference to or reliance upon the doctrine of res ipsa loquitur. Independently of that doctrine, there is evidence sufficient to permit the jury to infer negligence on the part of the doctors. But because a new trial is required, something should be said about whether the jury on such new trial should be instructed on the doctrine. We are of the opinion that it should.

It is somewhat difficult to separate the so-called conditional res ipsa doctrine from inferences predicated on circumstantial evidence, because res ipsa in such a case is, of course, a doctrine fundamentally predicated on circumstantial evidence, and the weight that should be given to it.

The facts of the present case present a clear situa-

tion where the conditional doctrine of res ipsa applies. If the jury finds certain facts, which they are entitled to find from the evidence, then the doctrine applies. Here we have an injury which is very rare. It is an injury that could result from negligence, or could result without negligence. Is it more probable than not that it was the result of negligence? That is the question. The plaintiffs, out of the mouths of defendants and their witnesses, proved that the injury could occur as a result of negligence. There is also evidence that the injury could occur without negligence. In such circumstances the jury should be instructed that if they find certain facts to be true they should apply the inference involved in res ipsa. Here we have an injury that is a *known risk* and rarely occurs. We have the instrumentality and the procedures involved completely in the control of defendant doctors. We have the boy under an anesthetic. Certainly the facts called for an explanation. The defendants explained what they did and testified that this was due care. But there was testimony that 90 per cent of the deaths resulting from cardiac arrest occurred by reason of faulty intubation. There was testimony that would justify the jury in inferring that if the operation had been performed within three minutes of the heart stoppage brain damage would not have resulted. We have evidence that temperature and apprehension increase the risk. We have the evidence of the erasures on the temperature chart. Under these circumstances the jury could find that it is more probable than not that the injury was the result of negligence. That is the test.

As stated in *Fowler* v. *Seaton,* 61 Cal.2d 681, 686 [39 Cal.Rptr. 881, 394 P.2d 697]:

"It is our opinion that the jury could find that the doctrine of res ipsa loquitur applies under the facts here involved. Generally, that doctrine applies 'where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible.' (*Siverson* v. *Weber,* 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97]; accord *Faulk* v. *Soberanes,* 56 Cal.2d 466, 470 [14 Cal.Rptr. 545, 363 P.2d 593]; *Zentz* v. *Coca Cola Bottling Co.,* 39 Cal.2d 436, 446 [247 P.2d 344].) . . .

"One of the frequently quoted statements of the applicable rules is to be found in the opinion of Chief Justice Erle in *Scott* v. *London & St. Katherine Docks Co.* (1865) 3 H. & C.

596, quoted in Prosser on Torts (2d ed. 1955) section 42, at page 201, as follows: 'There must be reasonable evidence of negligence; but where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care.'

██ "Of course, negligence and connecting defendant with it, like other facts, can be proved by circumstantial evidence. There does not have to be an eyewitness, nor need there be direct evidence of defendant's conduct. There is no absolute requirement that the plaintiff explain how the accident happened. ██ Res ipsa loquitur may apply where the cause of the injury is a mystery, if there is a reasonable and logical inference that defendant was negligent, and that such negligence caused the injury. (Prosser on Torts, *supra* at p. 204.)"

It is true that in *Siverson* v. *Weber,* 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97], the court affirmed a nonsuit in favor of a surgeon where the medical experts all testified that they could not determine the cause of the fistula there involved, and that fistulas do occur although due care is used. There is similar testimony here. The court in *Siverson, supra,* listed the usual causes of such injury and then stated (p. 838):

"There is nothing to indicate that if the fistula was caused by any of the factors listed above or any combination of them the injury sustained by the plaintiff was a result of negligence." And again at page 839: "No medical witness testified that in the rare cases where fistulas occur they are more probably than not the result of negligence." The court emphasized that the fact a particular injury is a rare occurrence does not in itself prove that the injury was probably caused by negligence.

Each case, of course, must be determined on its own facts. Here the facts are somewhat similar to those in *Davis* v. *Memorial Hospital,* 58 Cal.2d 815 [26 Cal.Rptr. 633, 376 P.2d 561]. There a rectal abscess occurred after an enema. There was medical evidence that 90 per cent of all such abscesses result from bacterial infection, that a mucous membrane normally prevents such infection, and that in the medical expert's opinion the insertion of the enema tube caused the break. There was other expert testimony that

the abscess was not so caused and probably resulted from other causes. After referring to the rule stated in *Siverson* v. *Weber, supra,* 57 Cal.2d 834, 836, above quoted, the court in *Davis* stated (p. 817) : ''Where the evidence is conflicting or subject to different inferences as to a fact necessary to the applicability of the doctrine, for example, as to whether an accident claimed by the plaintiff happened or whether an injury was caused by the conduct of the defendant rather than by the acts of someone else, the question of fact must be left to the jury under proper instructions. [Citations.] '' The court held that res ipsa instructions on a conditional basis should have been given.

The evidence in the present case, although not as strong as in *Davis,* is nevertheless sufficient to warrant conditional instructions on res ipsa. Dr. Cullen did testify that 90 per cent of the deaths occurring in patients under anesthesia from cardiac arrests were due to improper management of the airway. There was also testimony that exposure of an improperly premedicated patient to anesthesia not infrequently precipitates responses which endanger the life of the patient; that agitation and apprehension of the patient are danger signals; that the temperature of the patient is important, and normally, in an elective operation, anesthesia should not be given for 72 hours after the temperature becomes normal; and that failing to keep the tissues adequately oxygenated is the forerunner of many anesthetic complications. All of these, obviously, could involve negligence. It was for the jury to say whether it was more probable than not that any of them did. Thus, on the new trial, the jury should be instructed on this doctrine.

*Liability of the hospital.*

It has heretofore been demonstrated that the jury was justified in finding that Dr. Thornburg and Dr. Palmberg were negligent. That does not, of course, automatically, in the absence of an agency, impose liability on the hospital. But there was evidence from which an agency could be inferred. Dr. Thornburg testified that he had an active part in the management of the hospital. He was its acting administrator and a member of its board of directors. As acting administrator he came to an agreement with the group of anesthesiologists with whom he was connected to furnish a proper anesthesiologist upon demand of the hospital. Thereafter, as administrator, he presented the proposed plan to the directors, and as a member of the board, voted for it.

He conceded that either the anesthesiologists or the hospital could terminate the agreement at any time. Under this oral agreement the hospital got in touch with the group of anesthesiologists, and the group sent to the hospital the available doctor on the list. The hospital, of course, furnished the nurses who attended Reggie, and the operating room nurses. It also furnished all equipment used by the anesthesiologist, including the anesthetic.

When the mother of Reggie brought him to the hospital on July 10, 1960, she was required by the hospital officials to sign an "Authority to Operate," authorizing the physician in charge of Reggie "to administer such treatment and the surgeon to have administered such anesthetics as found necessary and to perform the" eye operation. This document was not only secured by hospital employees, but was witnessed by two employees of the hospital.

This evidence presented a question of fact to the jury. The factual situation is somewhat similar to that presented in *Seneris* v. *Haas,* 45 Cal.2d 811 [291 P.2d 915, 53 A.L.R. 2d 124], where the hospital was held liable for the negligence of an anesthesiologist. There, as here, the anesthesiologist was a member of the hospital staff, there, as here, the anesthesiologists used in the hospital were approved and appointed by the board of directors upon recommendation of the medical staff; the anesthesiologists there, as here, were on call by the hospital; there, as here, the anesthesiologist billed the patient; there, as here, all medications, white clothing, and nursing services, etc., were furnished by the hospital. There, unlike here, the anesthesiologist had no separate office, but took his calls from the hospital at his home. The court held that such a factual situation presented a question of fact as to whether an agency existed. The court stated (p. 831): "Unless the evidence is susceptible of but a single inference, the question of agency is one of fact for the jury [citation]. We said in *Rice* v. *California Lutheran Hospital,* 27 Cal.2d 296, 304 [163 P.2d 860], that 'It should be noted that a nurse or physician may be the servant of a hospital, thus requiring the application of the doctrine of *respondeat superior* even though they are performing professional acts. [Citations.]'

"In *Stanhope* v. *Los Angeles College of Chiropractic,* 54 Cal.App.2d 141, 146 [128 P.2d 705], the court said: ' "An agency is ostensible when the principal intentionally or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." "

(Civ. Code, § 2300.) In this connection it is urged by appellant that "before a recovery can be had against a principal for the alleged acts of an ostensible agent, three things must be proved, to-wit:" (quoting from *Hill* v. *Citizens Nat. Trust & Sav. Bank,* 9 Cal.2d 172, 176 [69 P.2d 853]) "[First] The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; [second] such belief must be generated by some act or neglect of the principal sought to be charged; [third] and the third person in relying on the agent's apparent authority must not be guilty of negligence. (1 Cal.Jur. 739; *Weintraub* v. *Weingart,* 98 Cal.App. 690 [277 P. 752].)"

" 'An examination of the evidence hereinbefore referred to which was produced on the issue of agency convinces us that respondent has met the requirements enumerated in the *Hill* case. So far as the record reveals appellant did nothing to put respondent on notice that the X-ray laboratory was not an integral part of appellant institution, and it cannot seriously be contended that respondent, when he was being carried from room to room suffering excruciating pain, should have inquired whether the individual doctors who examined him were employees of the college or were independent contractors. Agency is always a question of fact for the jury.' "

Under the theory of the *Seneris* case and of the cases referred to therein (see also *Smith* v. *Fall River Joint Union High School Dist.,* 118 Cal.App. 673, 681 [5 P.2d 930]; *Messner* v. *Board of Dental Examiners,* 87 Cal.App. 199, 204 [262 P. 58]; *Riskin* v. *Industrial Acc. Com.,* 23 Cal.2d 248 [144 P.2d 16]) the agency question was one of fact.

For all of the foregoing reasons the judgments notwithstanding the verdicts as to all three defendants must be reversed.

*The orders granting new trials.*

 Obviously, the new trial orders must be affirmed. One of the grounds specified in the written orders was insufficiency of the evidence. The granting of a new trial on this ground is, of course, within the discretion of the trial court. (*Yarrow* v. *State of California,* 53 Cal.2d 427 [2 Cal.Rptr. 137, 348 P.2d 687]; *Estate of Masrobian,* 207 Cal.App.2d 133 [24 Cal.Rptr. 263].) It is only where it can be said as a matter of law that there is no substantial evidence to support a different judgment that an appellate court will reverse an order granting a new trial on insufficiency. This is not such a case. As already pointed out many of the conclusions that

support findings of negligence by the doctors rest on inferences. The trial judge, contrary to the jury, was entitled not to make such inferences. Thus the new trial orders must be affirmed.

The judgments notwithstanding the verdicts as to all three defendants are reversed, and the orders granting all three defendants a new trial are affirmed, each side to bear its own costs on this appeal.

Tobriner, J., and Peek, J., concurred.

MOSK, J., Concurring and Dissenting.—The trial judge in granting the motion for a new trial concluded the evidence was insufficient to establish negligence. Under well settled law we must ordinarily assume this is so, but here the trial court erroneously failed to consider this a conditional res ipsa loquitur case, as the majority opinion so persuasively demonstrates it to be. (*Davis* v. *Memorial Hospital* (1962) 58 Cal.2d 815 [26 Cal.Rptr. 633, 376 P.2d 561].) The rule under these circumstances is that a "defendant will not be held blameless except upon a showing either (1) of a satisfactory explanation of the accident, that is, an affirmative showing of a definite cause for the accident, in which cause no element of negligence on the part of the defendant inheres, or (2) of such care in all possible respects as necessarily to lead to the conclusion that the accident could not have happened from want of care, but must have been due to some unpreventable cause, although the exact cause is unknown. In the latter case, inasmuch as the process of reasoning is one of exclusion, the care shown must be satisfactory in the sense that it covers all causes which due care on the part of the defendant might have prevented." (*Dierman* v. *Providence Hospital* (1947) 31 Cal.2d 290, 295 [188 P.2d 12]; *Roddiscraft, Inc.* v. *Skelton Logging Co.* (1963) 212 Cal. App.2d 784 [28 Cal.Rptr. 277]; *McDonald* v. *Foster Memorial Hospital* (1959) 170 Cal.App.2d 85, 102 [338 P.2d 607]; *Bischoff* v. *Newby's Tire Service* (1958) 166 Cal.App.2d 563, 569 [333 P.2d 44]; *Oldis* v. *La Societe Francaise* (1955) 130 Cal.App.2d 461, 469 [279 P.2d 184]; *Talbert* v. *Ostergaard* (1954) 129 Cal.App.2d 222, 228 [276 P.2d 880].) If the res ipsa loquitur inference had been invoked herein, I would find that the defendants failed to overcome it by adequate affirmative evidence, and the trial court would not, or should not, have granted the motion for a new trial on the ground of

insufficiency of the evidence. (*Gerhardt* v. *Fresno Medical Group* (1963) 217 Cal.App.2d 353, 361 [31 Cal.Rptr. 633].)

To approve the granting of this motion penalizes the plaintiff who offered a proper res ipsa loquitur instruction, favors the defendants who erroneously opposed the res ipsa theory and instruction, and affirms the trial court which the majority opinion finds was in error. This is a result in which I cannot acquiesce.

The majority opinion does not discuss the question of excessive damages as a ground for new trial. Defendants here concede the injuries were both severe and permanent but attempt to support the claim that damages were excessive on the theory that ''common knowledge would seem to dictate that the life expectancy of a child 6 years old in plaintiff's condition could not be long.'' No authority is cited to justify bringing that medical subject under the umbrella of common knowledge.

I concur in reversing the judgments notwithstanding the verdicts. I would reverse the order granting defendants a new trial.

TRAYNOR, C. J.—I concur in the judgment.

Since there is substantial evidence to support a verdict for plaintiffs, I agree that the judgments notwithstanding the verdict must be reversed. I likewise agree that the orders granting a new trial must be affirmed because there is substantial evidence to support a verdict for defendants. I cannot agree, however, that the doctrine of res ipsa loquitur is applicable or that verdicts could be sustained on certain other theories of negligence invoked by the majority opinion.

''As a general rule, res ipsa loquitur applies where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. . . . In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied on both common knowledge and the testimony of expert witnesses.'' (*Siverson* v. *Weber*, 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97].)

Since the possible causes of cardiac arrests are not a matter of common knowledge (cf. *Davis* v. *Memorial Hospital*, 58 Cal.2d 815, 817 [26 Cal.Rptr. 633, 376 P.2d 561]), expert testimony is required before a conditional res ipsa loquitur instruction would be proper. Expert testimony that it is more

probable than not that negligence is the cause of cardiac arrests, if believed, would permit the jury to draw an inference of negligence solely from the fact that the arrest occurred. In deciding whether an instruction on the doctrine should be given, it is therefore irrelevant that there may be facts other than the occurrence itself to suggest that the arrest was caused by negligence. Although such facts, if present, might be independent proof of negligence, they have no bearing on the question whether the jury should be permitted to draw an inference of negligence on the happening of the cardiac arrest alone. Hence reliance on evidence that the defendants may have failed properly to appreciate plaintiff's apprehension and temperature is misplaced. The only question relevant to determining whether a res ipsa loquitur instruction should be given is: Has evidence been offered by expert testimony that when cardiac arrests occur, they are more probably than not caused by negligence?

No such expert testimony appears. Plaintiffs rely on testimony of both defendant doctors that, when due care is used, cardiac arrests do not ordinarily occur. This testimony, however, fails to establish anything with respect to the question whether, among the possible causes, negligence is the more probable one when these arrests do occur. It is true that cardiac arrests do not ordinarily occur when due care is used because, as all the testimony makes clear, a cardiac arrest is a rare occurrence. As stated in *Siverson* v. *Weber, supra,* 57 Cal.2d 834, 839, however, "The fact that a particular injury suffered by a patient as the result of an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation." The record shows that plaintiffs' counsel was fully aware of this holding in the *Siverson* case. He could easily have framed his questions to elicit testimony as to the probability of negligence when cardiac arrests occur, but he did not do so.

Plaintiffs also rely on expert testimony "that 90 percent of the deaths occurring in patients under anesthesia are due to improper management of the airway." This testimony, however, cannot reasonably be interpreted to mean that when cardiac arrests occur, it is more probable than not that they are caused by negligence. Thus, this percentage covers deaths other than those following cardiac arrests. The expert who offered this estimate testified that deaths may occur under anesthesia from disturbances that are at least as likely to

happen as cardiac arrests. He did not testify that 90 percent of *cardiac arrests* were caused by improper management of the airway. Moreover, his testimony makes clear that by "improper management" he did not mean faulty or negligent management. He defined "improper management" as any failure "to maintain the free movement of air." Although he admitted that such failures could be prevented in many instances by an anesthesiologist exercising due care, he denied that mismanagement by the anesthesiologist is necessarily involved, and could not say that it is probably the cause when cardiac arrests occur.[1]

Defendant anesthesiologist testified that the most common cause of cardiac arrest is direct or indirect stimulation of the vagus nerve. He added that in his opinion such stimulation was the cause of this cardiac arrest. He testified further that there were several stimuli that might have been operative. This testimony, however, sheds no light on whether negligence is more probably than not the cause of bringing any of these stimuli into play. Moreover, the record presents abundant uncontradicted evidence that the medical profession is in doubt as to the causes that ultimately bring about the physiological events leading to cardiac arrest. In view of such evidence, the most that can reasonably be concluded from the medical testimony with respect to the probabilities of negligence as a cause of cardiac arrest is that negligence will increase the risk of its occurrence. There is no expert testimony that when it does occur, negligence is more probably than not the cause. Accordingly, plaintiffs are not entitled to invoke the doctrine of res ipsa loquitur.

The question remains whether there is any evidence that defendants failed to possess and exercise that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of their profession under similar circumstances. (*Sinz* v. *Owens*, 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757].)

There is no evidence that defendant doctors were negligent in making the initial decision to operate. Although the child

---

[1]The testimony in question is as follows:

"Q. What do you mean by improper management of the airway? A. It has not been managed to maintain the free movement of air."

"Q. That is due to the anesthesiologist's mismanagement? A. No, that doesn't mean that, necessarily. It means that sometimes it is impossible to do this."

"Q. In most instances it is preventable in the exercise of due care by the anesthesiologist, isn't it, Doctor? A. In many instances it is."

was "very apprehensive" and "very agitated" on the morning of the operation, undisputed medical testimony rejected the view that this condition contraindicated surgery. The hospital records show that preoperative medication,[2] administered in part to allay the patient's apprehension, was "unsatisfactory." Defendant anesthesiologist testified that "unsatisfactory" did not mean "not sedated to the extent he should be." It meant only not "sedated to the extent I should like to have [him] sedated." The testimony of the Chairman of the Department of Anesthesiology of the University of California at San Francisco confirmed that many children are "very apprehensive"[3] just prior to an operation and that an attempt to reduce this apprehension by further sedation might dangerously depress circulation and respiration. This expert also testified that he would have administered anesthesia "under those circumstances" and that standard practice did not require the anesthesiologist to postpone it. Plaintiffs introduced no other testimony that would permit a jury to evaluate the significance of "very apprehensive," "very agitated," and "unsatisfactory" in a medical context. Hence, even if the jury did not believe the explanations offered, plaintiffs would not have met their burden of proof.

The record of the child's temperature adds no more. The temperature had risen to 100.6 on the eve of surgery. Defendant ophthalmologist investigated the fever and found that the rise was not due to any infection that would increase the risk of complications under anesthesia. Plaintiffs offered no evidence to the contrary. The hospital chart shows that the child's temperature was below normal on the morning of surgery. Medical experts testified that such a sequence of events would not contraindicate surgery. Although a hand-

[2]Defendant anesthesiologist offered undisputed testimony that nembutal was administered to allay apprehension; atropine, to depress reflexes and decrease secretions. Although the dosage of atropine was twice that given at the first operation, there is no evidence connecting that increase with the possible causes of cardiac arrest. On the contrary, defendant anesthesiologist testified that atropine is used specifically to decrease the sensitivity of the vagus nerve to reflexes that may occur during anesthesia. Moreover, expert testimony is uncontradicted that the child was prepared for the operation according to standard procedures.

[3]Neither party asked this expert any questions about the significance of "very agitated." Defendant anesthesiologist, who used this term in his post-operative report, testified that he used it as a synonym for "very apprehensive." He also testified that he used "very apprehensive" to summarize the fact that the child was crying and uncooperative.

writing expert testified that a relevant part of the temperature chart showed signs of an erasure, he also testified that there "was no indication under the microscope of what had been erased nor precisely where it was." Moreover, on cross-examination he "couldn't positively say" that there had been any writing beneath the erasure. No jury could reasonably make a finding of negligence on the basis of such testimony.

There is also no evidence that defendant ophthalmologist was under a duty either to possess the skill to perform a thoracotomy in the event of a cardiac arrest, or to see to it that a competent surgeon was in the operating room at all times. Every medical witness testified that it was standard practice to call in a thoracic or general surgeon in the event of cardiac arrest. No medical witness testified that it was standard practice for an ophthalmologist to possess such skill. It is true that one surgeon, who otherwise agreed with these conclusions, said on cross-examination, "Anybody, any surgeon who is operating in a hospital, . . . in dire circumstances should be able to do an open chest operation." Yet he added, "However, if he has any choice whatsoever and he has never done this, and he has anyone better qualified in the immediate vicinity he is well advised to have them do it." The rest of this surgeon's testimony indicates that by "immediate vicinity" he did not mean that a competent surgeon ought always to be present in the operating room itself. Moreover, this expert testified that he had been active in the local campaign designed to alert all specialists to the possibility of cardiac arrest and to inform them about the procedure of thoracotomy. Yet he testified that despite this campaign most specialists could not be expected to perform the operation. Hence his statement that any operating surgeon should be able to open a chest can reasonably be interpreted only as an expression of an ideal that had not yet become a standard of care. Hence no jury could reasonably conclude that defendant ophthalmologist failed to meet the standard of care by not performing the thoracotomy himself or not insuring the presence of a competent surgeon in the operating room at all times.

There is evidence, however, that defendants were negligent in failing to make reasonable preparation for the possible occurrence of a cardiac arrest. (See Harper and James, The Law of Torts (1956) § 16.11, p. 939; Prosser on Torts (3d ed. 1964) pp. 173, 343-344.) Both defendant doctors knew that cardiac arrest was an inherent risk of surgery under

anesthesia. Both testified that when an arrest occurs every second counts. Both doctors had good reason to believe that a general surgeon would be readily available in the area surrounding the operating room. It may be inferred, however, that they did not confer before the operation to plan an efficient procedure for summoning such a surgeon in response to a possible emergency. Thus, defendant ophthalmologist testified that he could not remember any conversation with the anesthesiologist, although "frequently we have a conversation about the operation prior to surgery." Moreover, defendant anesthesiologist was apparently unaware of the inability of defendant ophthalmologist to perform a thoracotomy, for when the arrest occurred he did not immediately send for a general surgeon. Instead, after it became apparent that external massage had failed, precious time elapsed while the ophthalmologist came to the table, revealed his inability to open the chest, and went to the door to get the general surgeon. More time passed while the general surgeon entered the room and put on gloves before making the incision. Although the record does not specify how much time these steps entailed, a jury could reasonably conclude from defendant ophthalmologist's testimony that the additional loss of time was enough to cause the brain damage. This time might have been saved had preparations been made for summoning the general surgeon as soon as a cardiac arrest was suspected, so that he could be ready to open the chest at the moment it became apparent that external massage had failed.

Although there is no expert testimony that the prevailing medical standard of care requires such preparation for a possible cardiac arrest, expert testimony is not required when scientific enlightenment is not necessary to show that failure to make such preparations is unreasonable. (*Ales* v. *Ryan,* 8 Cal.2d 82, 100 [64 P.2d 409]; *Barham* v. *Widing,* 210 Cal. 206, 214 [291 P. 173]; see *Lawless* v. *Calaway,* 24 Cal.2d 81, 86 [147 P.2d 604]; *Bruce* v. *United States,* 167 F.Supp. 579, 583; Prosser on Torts (3d ed. 1964) p. 167.) On that basis alone, I would reverse the judgments notwithstanding the verdicts.

McCOMB, J.—I dissent. I would affirm the judgment in favor of defendants for the reasons expressed by Mr. Justice Salsman in the opinion prepared by him for the District

Court of Appeal in *Quintal* v. *Laurel Grove Hospital* (Cal. App.) 38 Cal.Rptr. 749.

Schauer, J.,* concurred.

Respondents' petitions for a rehearing were denied January 13, 1965. Traynor, C. J., and McComb, J., were of the opinion that the petitions should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.