[Civ. No. 12319.   Second Appellate District, Division One.—January 24, 1940.]

MYRTLE V. BLANKENFELD, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

Walter Gould Lincoln for Petitioner.

Everett A. Corten, F. Britton McConnell and Eugene Kelly for Respondents.

YORK, P. J.—Petitioner, the widow of William Blankenfeld, seeks to review and annul the findings and award of respondent commission wherein it was found that said William Blankenfeld, the deceased employee, came to his death on October 25, 1938, but that said employee's death was not

proximately caused by injury arising out of and occurring in the course of his employment.

It is here contended that the decision of the respondent commission lacks support in the record and in authority for the reasons (1) that there was no true conflict of evidence and therefore the so-called findings were error; (2) that the respondent commission did not show there was no causal connection between the overexertion and strain of October 18, 1938, and the thrombosis and hemorrhagic condition of the heart discovered on October 27, 1938.

In order to pass upon the questions presented, it is necessary to analyze the testimony adduced at the hearing: It is revealed by the record herein that William Blankenfeld was 65 years of age at the time of his death, and that for a period of approximately 15 years theretofore he had been employed by various moving picture companies as a grip, and was accustomed to doing heavy work including the lifting and moving of heavy objects. The grip department of a moving picture studio has charge of the diffusing and shading of sunlight and artificial light on the sets; the erection and moving of all camera and light parallels, which are platforms on rollers, and the building and maintenance of all equipment necessary to the production of a moving picture.

At 6:45 o'clock on the evening of October 18, 1938, when decedent was employed on a work-shift from 1 until 7 o'clock in the afternoon, he was directed to move a parallel weighing between 500 and 600 pounds assisted by a fellow-workman named Kashuk. The men found the parallel in such a position between a wall and a ramp that it became necessary to lift it over the end of the ramp in order to place it in the desired location. This ramp was eight or ten feet wide and tapered from eight or nine feet to nothing. The ramp and the wall were far enough apart to allow the parallel to be placed within eighteen inches of the bottom of the ramp, and at the time the two men started to lift the parallel, Kashuk testified that he was at the lower end of the ramp where it was about six inches from the floor, and decedent was "at a point where it (the ramp) was about eighteen inches from the floor, and the parallel more or less had to be lifted at one time", and he guessed decedent lifted higher than he did; that after they had finished this piece of work and started back to the grip room preparatory to leaving the studio for

the day, decedent claimed that "he ached all over and I drew the conclusion it was from the parallel, because of the fact that my back ached too".

Petitioner testified that her husband had been regularly employed as a grip for at least ten years; was in good health and never complained; that he was five feet six inches in height, and weighed one hundred thirty-two pounds and was very strong for a man of his size; that on the evening of October 18, 1938, he returned home from his day's work and said he did not feel well; that he ate very little dinner and retired early but did not sleep; that he told her in lifting a parallel that day the weight had shifted a little more to him and he felt something break in his chest, and that he hurt his knees; that he ached all over and complained of a pain in his chest through the heart region. The next day, October 19th, he returned home after working about three hours and said he "felt awfully bad and seemed to be in considerable pain . . . through the heart region, and across his back and his knees. . . . He couldn't eat anything." He worked on the 20th and during that day was sent to the first aid department and in turn was sent to Drs. Dickey and Cass, doctors for the insurance carrier, who put him under a light, but did not examine him; that he still complained to her of the pain in his back and chest. On the 21st he again returned to work but in the evening he said he felt awfully bad and stated to his wife, "I think I would be pretty well if I hadn't gone over and helped the fellow lift those planks . . . We had to lift them up and it seemed to hurt me." That night petitioner called the family physician, Dr. Ringnell, and for the next two days decedent remained in bed most of the time, complained of pain in his chest and seemed exhausted. On the morning of the 24th "he got up in the morning and sat out in the sun for about two hours that day, and then he went back, he said he guessed he felt better in bed; so he went back to bed again until evening, he got up and went to the bathroom and that was where I found him. He had fainted and fallen on the floor . . . he had fallen against the glass knobs on the doors and cut his head in two places." Petitioner then called Dr. Reinhart, the neighborhood doctor, who dressed the wounds and gave him some shots, which produced a coma from that time until he passed away at 5:10 o'clock the next morning, October 25th. Petitioner further testified that so

far as she knew, when her husband fainted and fell on the night of the 24th, it was the first time he had fainted in his life, and that he never had any spells of unconsciousness prior to that time.

Harland West, foreman of the grip department at R. K. O. Studios for eight years, testified that decedent was a ''very good workman, very trustworthy and dependable'', and performed his duties properly and satisfactorily; that decedent on October 19th complained to him of feeling nauseated and ill, and told him that he had strained himself when he lifted a parallel the day before.

Dr. Reinhart testified that he attended decedent on the night before he died and was also present at a post-mortem examination made by the coroner's physician which showed a hemorrhage into the heart muscle, coronary thrombosis and pleurisy and that an acute myocarditis must have formed; that taking into consideration the fact that there was no history of any prior heart trouble, it was his opinion that the condition found to exist was attributable to the strain of lifting of which decedent had told him when he called to see him; that he also discovered at the post-mortem examination that the muscles of the heart had ruptured and separated. When asked with reference to chronic myocarditis being present at the time of the examination, he replied: ''If there had been chronic enlargement of the heart, unless it was some time prior to the accident, it would not cause a rupture of the heart.'' This doctor defined chronic myocarditis as enlargement of the heart which is to be expected in people of decedent's age, but not a cause of death by itself, ''especially when there are no complaints any other way''.

A written statement of Dr. F. O. Ringnell was introduced in evidence to the effect that he had been decedent's family physician for twenty-five years but had not attended decedent for any illness during that period nor had he ever observed in decedent any indications or symptoms of heart disease; that he was called to see decedent on October 21, 1938, and was told that on October 18th decedent in lifting a heavy standard of some sort in the studio felt something give way in his chest or in the heart, causing him severe pain; that the standard got out of balance and its entire weight was thrown against decedent causing it to strike his knees; that

decedent was taken to a dressing station and later was taken to a clinic (evidently referring to Drs. Cass and Dickey). When he attended decedent on October 21st, Dr. Ringnell found decedent weak and in shock, pain in both knees and a bruise upon the left knee; he prescribed a heart stimulant and ordered rest; he saw decedent again on the 23d and also on the 24th when he was called at 7 o'clock in the evening and found decedent unconscious and in a dying condition. He stated that, in his opinion, decedent could not have done the work which he had been doing for years if there had been any heart injury previous to October 18th and he was of the belief that decedent died as the result of the injury to his heart occasioned by his overlifting on October 18th, which in turn caused acute dilatation.

One T. J. Connolly, employed as a grip at the R. K. O. Studios, testified that he was on a scaffold above decedent and Kashuk when they were moving the parallel on October 18th, and when they came to the ramp which was built in such a way that they could not get over it "without lifting one roller of the parallel and rolling it over", because it was tight in between the wall and the ramp, they had to lift the parallel up over one side of the ramp. Said witness testified that "Kashuk was on the front end here and Mr. Blankenfeld was over on this corner (indicating opposite sides of the parallel), and when they started to lift it Kashuk got it part way up and just as he started to get it up over there, instead of letting it where it rests solid, he let go and as he let go, he said 'Let's get some help', and the whole weight of the parallel was thrown on Mr. Blankenfeld . . . as the whole weight came on him he caught it on his arms," and some electricians who heard Kashuk ask for help went over there. Connolly also testified that the cross-brace of the parallel "would just about get him (decedent) above the knees", and that decedent staggered back a little bit, but did not go down with the weight; that shortly thereafter the witness talked to decedent and the latter told him he felt sick and felt a strain across his chest.

The testimony of Wm. Croff, the electrician who helped to lift the parallel in question, was as follows: "The ramp came in at a slant to the wall and left a wedge-shaped clearance with the wall and the ramp. And I would say that the width of the parallel which is about eight feet would leave the ramp about two feet high . . . And they had the parallel jammed

against the wall and against this ramp where they couldn't lift it. They needed more help to get it away from the wall in order to get it freed and over the ramp." The two men were standing there holding the parallel with two wheels on the floor and one wheel on the ramp with the parallel so tilted that its handrail was thrown against the wire mesh and against the wall so it had to be pulled away from the wall in order to move it.

At the conclusion of petitioner's case, there were introduced in evidence and marked defendant's exhibits 3, 4 and 5, respectively, the report of Dr. Cass, the report of Dr. Gaulden and the autopsy report of Dr. Maner.

The report of Dr. Cass dated October 26, 1938, was as follows: "This patient came to us on October 20, 1938, and gave the following history: Aged, fifty-six. Married. Occupation, grip. On October 18, 1938, he was lifting a ten foot parallel and felt a sprain and pain in his chest and both arms.

"There was no physical evidence of injury. No deformity. His pains were not localized or associated with any changes indicating an injury.

"The tentative diagnosis was sprain of the pectoral muscles and arm muscles, both sides.

"He was not considered disabled. He did not return for further treatment."

Dr. Gaulden's report to the insurance carrier contains the following: "As per your request I attended the autopsy done on the body of Mr. Blankenfeld on Oct. 27th, the autopsy being done by Dr. George Maner. A previous autopsy had been done by Dr. Newbarr, the County autopsy surgeon.

"Examination of this body showed a wound on the left scalp, showed a coronary thrombosis, coronary arteriosclerosis and infarction of the heart muscles. . . .

"From the history which was given me, this patient reported to Drs. Dickey and Cass several days before his death complaining of pain in his chest and both arms, claiming he thought he had strained his chest in a lifting effort. It is my understanding from Dr. Cass that there were no objective findings of any injury. I am told also that patient returned to work and worked for several days before his death and he died very suddenly, and naturally when he fell shortly before his death, he struck his scalp on some object as he fell, causing the scalp wound.

"From the findings it would indicate this man died from a coronary thrombosis and the condition was not related or exacerbated by his employment or his alleged injury."

Upon cross-examination, Dr. Gaulden admitted that he never examined decedent's heart and that he "only saw the autopsy"; that he did not receive any history of the case before he examined the heart at the time of the autopsy. "I received history from Dr. Cass, who saw the man, the man reported to his office and complained of pain in his chest muscles as a result of a lifting effort. Q. At that time Dr. Cass did not examine his heart at all, did he? A. I don't know. Q. That is, so far as he told you? A. No, he didn't tell me anything about examining him then. Q. And so far as there is any evidence here there was no statement by Dr. Cass or Dr. Dickey that the heart was examined at that time? A. No, I might say they might not have found anything on examination anyway. This type of heart oftentimes you·can't find it. Q. That is problematic. All I am able to go on is what they did or did not do. A. I do not know what they did. Q. That is all the history of the case you received at the time you saw·his heart? A. That is right. . . . Q. Do I understand you to say that from your examination of the patient's heart, or what you saw of the patient's heart at this particular time when it was shown to you, and from the history of the case which was given you at that time and which you have just given to us, you made up your mind and your opinion that there was nothing abnormal about the gentleman's death? A. I decided that there was nothing that he had that would have been caused by any lifting effort; that he died from natural causes which were coronary sclerosis and coronary thrombosis."

The report of Dr. George D. Maner shows that he performed an autopsy on October 27th at the request of Drs. Donald Cass and C. L. Gaulden of the Lumbermen's Mutual Casualty Company. The findings of this surgeon reveal, among other things, the following: "Body is that of a white male, age approximated at 50 years and height at 5 feet 8 inches. . . . The heart has been removed and the chambers of the left side have been opened. On the posterior aspect of the left ventricle there is a hemorrhagic blotch covering an area about 6 x 4 cm. This is indefinitely outlined and there is a superficial incision extending transversely across

it. The left ventricle is moderately hypertrophied and multiple sections from the apex to the base reveal an area of infarction involving the discolored area. . . .

"Microscopic: Sections of coronary arteries show a marked degree of sclerosis. . . . In the circumflex branch there is a thrombus which shows slight early organization. . . .

"I am of the opinion that the cause of death is a natural one, namely, coronary sclerosis with thrombosis and infarction of the heart muscle. The coronary sclerosis is of long standing but the thrombosis is relatively recent. The infarction or sclerosis of the heart muscle, of course, results from the blocking off of the circulation in the coronary artery by the thrombus. . . .

"Cause of death: Coronary arteriosclerosis with thrombosis and infarction of heart muscle."

Dr. Newbarr, the coroner's surgeon, performed the first autopsy upon the body of decedent and signed the certificate of death, in which he gives the principal cause of death as "Acute dilatation of the heart," and gives as other contributory causes of importance, "Chronic Myocarditis; Hemorrhage into heart muscle."

■ From the foregoing *résumé*, it becomes at once apparent that both the doctors and the laymen, who observed the decedent shortly after the lifting incident, with the exception of Dr. Cass, were of the opinion that death was directly attributable thereto, while the medical experts representing the insurance carrier, as well as the surgeon, who performed the second autopsy at the request of such carrier, were of the opinion that death was caused by a preexisting pathological condition of the heart without reference to the strain of lifting the parallel which weighed between 500 and 700 pounds.

With respect to the evidence adduced on behalf of respondents and which it is claimed presents a conflict, it should be pointed out that Dr. Cass was not called as a witness and from all that appears in the record he made no examination of decedent's heart when the latter called to see him on October 20th. Dr. Gaulden never saw or examined decedent in his lifetime, and his opinion as to the cause of death was based upon the condition of the heart as observed by him at the autopsy performed by Dr. Maner at the request of the insurance carrier, and upon an incomplete and inaccurate history of the case obtained by him from Dr. Cass and from

two witnesses whose testimony he heard while waiting to be called to the stand at the hearing before the commission. The opinion of the autopsy surgeon Maner is based solely upon the condition of the heart which he found to exist after death.

It is interesting to note that the cause of death shown in the certificate signed by Dr. F. D. Newbarr, the coroner's surgeon, who performed the first autopsy upon decedent's body, is in complete agreement with the evidence adduced at the hearing on behalf of petitioner.

In the case of *Mark* v. *Industrial Acc. Com.*, 29 Cal. App. (2d) 495, 500 [84 Pac. (2d) 1071], the court held that expert testimony is no stronger than the facts upon which it is predicated, citing in support of such theory *Winthrop* v. *Industrial Acc. Com.*, 213 Cal. 351, in which latter case the Supreme Court said at page 354 [2 Pac. (2d) 142]: "The case does not present a true conflict of evidence. The opinions of the doctors who were of the view that the fall did not produce the twisting of the pedicle, as stated in their letter reports, were based on the theory that severe symptoms did not appear until some time after the fall. The evidence, on the other hand, shows that petitioner suffered severe abdominal pains almost immediately thereafter, although her condition naturally become aggravated as time elapsed. Said opinions being based on a state of facts not shown by the record to exist, are not in conflict with the opinions of the doctors whose statements were based on the facts actually shown to exist by the evidence of petitioner and the doctors who attended her."

It was further stated in the Mark case, *supra*, at page 500: "Assuming, if necessary, that decedent was afflicted with a weak and somewhat devitalized heart, that in itself is not determinative of the question here. If deceased was afflicted with such a condition and thereafter subjected himself to violent exertion and extraordinary strain in the course of his employment which caused his death sooner than he otherwise might have suffered, his dependents are entitled to compensation. (*Eastman Co.* v. *Industrial Acc. Com.*, 186 Cal. 587 [200 Pac. 17].) We have the undisputed testimony that the work of cranking the engine was both unusual and exhausting. Whether or not decedent was so engaged in work that required an unusual physical exertion is a matter which should

have been determined by the commission. (*Knock* v. *Industrial Acc. Com.*, 200 Cal. 456 [253 Pac. 712].)''

The contention of petitioner that the award of the commission denying compensation for the death of her husband lacks support in the record must be sustained. The award is therefore annulled and the cause remanded.

Doran, J., concurred.

WHITE, J., Concurring.—I concur. The cause of the death being coronary arteriosclerosis with thrombosis and infarction of heart muscle, or acute dilatation of the heart, it is at once apparent that the only reasonable conclusion to be derived therefrom in accordance with the evidence introduced at the hearing before the commission is that there was a causal connection between the severe exertion attendant upon lifting the parallel and the death of the employee. It does not require a medical education to realize that in the commonly accepted and generally recognized version a coronary thrombosis is simply a blood clot in an artery which shuts off the supply of blood to the heart. It is also common knowledge that excessive exertion or exercise is intimately connected in the production of coronary artery thrombosis. In fact, medical science seems to teach that excessive exercise or exertion are directly concerned in the primary causes of the condition leading up to the attack. This employee, the evidence indicates, suffered from a myocardial disease due to coronary sclerosis, and by reason of his exertion in the course of his employment the coronary thrombosis ensued. The latter ailment is generally recognized as an obstruction, ordinarily acute, of a branch of one of the coronary arteries, resulting in infarction and death of the area supplied by the occluded vessel. The shock, exertion or exercise is medically recognized as producing the coronary artery thrombosis, although it may have little relationship with the fatal attack, which, as in the case before us, may take place several days later. In other words, had this patient not received the shock occasioned by overlifting and later by overexertion in handling the planks, he would probably have gone on living as he had been with the chronic myocarditis and arteriosclerosis condition, which is common to men of his age; but it was the overexertion occasioned by his employment which

started in motion the coronary thrombosis that took his life. True, he might have died from any other type of overexertion, such as cranking his automobile or running for a street car, but the facts here present point unerringly to an association between the decedent's overexertion while performing services for his employer and the fatal thrombosis attack.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 21, 1940.