[Civ. No. 493.   Fifth Dist.   Oct. 20, 1965.]

FOREMOST DAIRIES, INC., Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, JOAN MARY McDAN-NALD et al., Respondents.

Russ & Moore and John W. Moore for Petitioner.

Everett A. Corten and Sheldon C. St. Clair for Respondents.

BROWN (R. M.), J.—This is a proceeding to review an order of the Industrial Accident Commission which granted an application for death benefits to the widow and two minor dependent children of Oral E. McDannald, who died on November 5, 1963, as a result of what was found to have been an industrial injury which he sustained on or about August 1, 1963. A petition for reconsideration was denied by the commission on January 28, 1965.

The award included disability indemnity of $90, a death benefit of $20,500, burial expense of $600, reimbursement for self-procured treatment payable $709.10 to Occidental Life Insurance Company of California, $72 to the Department of Employment and $266 to the widow, and reimbursement of medical legal expense of $350. Liens were allowed to the Department of Employment, to the attorneys for the applicants, and a lien in favor of Occidental Life Insurance Company in the amount of $709.10 was allowed.

Petitioner contends (1) that the evidence is insufficient to sustain the finding that the decedent was injured during the course of his employment; (2) that the evidence is insufficient to establish that the injury proximately caused death; (3) that it was error to allow reimbursement for self-procured

medical expenses; and (4) that the commission erred in allowing a lien to Occidental Life Insurance Company.

The petitioner, Foremost Dairies, Inc., is permissibly self-insured. The decedent was a 42-year-old route milkman who had been employed by the petitioner for over 10 years. He reported for work at about 3:30 a.m. and generally left the plant about 1:15 to 1:30 p.m. In addition, the decedent cared for the lawns of several customers during the afternoon hours and on his days off. He owned a Chevrolet truck which he drove to and from his employment with petitioner and on his lawn care route.

On or about August 1, 1963, the decedent injured his right leg, in the lower area and on the shin, by striking it either against the truck which he drove in his employment with petitioner or on the corner of some crates. The accident occurred at petitioner's plant while the decedent was on the job. The injury consisted of a bruised area and a cut about an inch in length with an angry red inflammation around it. On August 4, 1963, decedent and his family departed on a vacation in Canada, traveling by automobile, with decedent driving. About August 10, the decedent became violently ill, and vomited most of the night. The next day he was exhausted. As they were returning home the decedent told his wife that he did not "feel too good." He returned to work on August 26, 1963, and during the next seven weeks he complained to her about four times that "he felt pooped and that he had slight shortness of breath." On October 13, 1963, the decedent returned home from work and complained "my breathing is getting worse . . . I feel exhausted." The next day, he went to see the family physician, Dr. George Nelson. He was also examined by Dr. Richard F. Hoffman, a chest specialist. On October 23d decedent complained to his supervisor that he felt "real bad," that he was exhausted and had shortness of breath. He asked for the next day off. On October 24 he complained to Dr. Nelson who noted "sharp pain in left rib area since yesterday and becoming worse today. Pain on breathing." Decedent then saw Dr. Vinnard, a physician associated with Dr. Nelson, who taped him for pleurisy and gave him antibiotics for pneumonia. Decedent worked on October 26th but his supervisor noted that he was exhausted and helped him to unload his truck and told him to go home. Decedent returned home and complained of exhaustion and of a hard feeling in the chest and a bad pain in his side. That was his last day of work for petitioner. Between October 26th and October 27th he started spitting blood.

Decedent was admitted to Fresno Community Hospital on October 30, 1963. He was examined by Dr. T. R. Eliason, who noted that the decedent had shortness of breath in the past three or four weeks. Under the "Impression" heading of his report, Dr. Eliason noted the following:

"1—Pericarditis, myocarditis and leftsided pneumonia.

"Consider differential diagnosis of tuberculosis, coccidioidomycosis, rheumatic fever, viral infection, lupus erythematosus or peri-arteritis nodosa, bronchogenic carcinoma.

"Diagnostic study will proceed as agreed with Dr. Nelson."

Dr. C. C. Gray was also consulted on November 1. In his report dated November 3, 1963, he notes: "I fear the prognosis here is very poor and cannot add anything to the differential diagnosis already stated by Dr. Nelson and Dr. Eliason. One has a frustrated feeling that for a young man we would like to try heroics in all directions but I guess any reasonable attempt should be made . . . Establishing the etiological factor here, at the present time, at least, primarily academic."

Dr. Gray's impression was of an influenzal or virus pneumonia with a secondary myocarditis and congestive failure approaching complete circulatory collapse.

The decedent died on November 5, 1963.

The physicians attending at the time of his death did not know what caused his condition or his death. Therefore, an autopsy was arranged. Dr. J. J. Bocian performed the autopsy; all of the treating doctors were present. Dr. Bocian testified at some length. He summarized the cause of death as extensive embolization of the lungs with infarction and "right heart failure due to extensive involvement of both lungs by old and recent emboli and also recent infarctions." He stated there was fluid in the abdominal cavity, and the liver was enlarged and firm, which would tend to show the right heart was failing. Some of the infarcts appeared to be fresh, perhaps a day or two old. Others appeared to be several days old. Some areas of large thrombi were at least several weeks old. As a result of Dr. Bocian's findings he advised the widow and her attorney, after an exchange of correspondence and conferences, that he felt the leg injury of August 1963 was the proximate cause of death.

Thereafter, on July 28, 1964, an application for death benefits was filed in behalf of the widow and minor children of the decedent. Hearings resulted in the award hereinabove summarized.

The record in the present case must be reviewed in the

light of applicable appellate review principles. ▪ As was stated in *National Auto. & Cas. Ins. Co.* v. *Industrial Acc. Com.,* 216 Cal.App.2d 204, at page 211 [30 Cal.Rptr. 685]: "This court is governed by the rule that the determination of the weight of the evidence and the credibility of the witnesses is within the province of the commission. (*Keeley* v. *Industrial Acc. Com.,* 55 Cal.2d 261, 265 [10 Cal.Rptr. 636, 359 P.2d 34].) That rule is applicable with respect to the reports and testimony of examining physicians. (*Havel* v. *Industrial Acc. Com.,* 154 Cal.App.2d 737, 742 [316 P.2d 680].) ▪ If substantial evidence supports the commission's findings, this court is not authorized to disturb them. (*State of California* v. *Industrial Acc. Com.,* 196 Cal.App.2d 10, 17 [16 Cal.Rptr. 323].) "

▪ The question of whether or not an applicant sustained any injury in the course of his employment is purely a question of fact. (*Travelers Ins. Co.* v. *Industrial Acc. Com.,* 32 Cal. App.2d 643, 644 [90 P.2d 327]; 2 Hanna, The Law of Employee Injuries and Workmen's Compensation, p. 134.) The Legislature has imposed a statutory duty upon the courts to liberally construe the provisions of the Workmen's Compensation Act (Lab. Code, § 3202) and the courts have been cognizant of, and met, that duty in order to effectuate the law's beneficent purposes. (*Colonial Ins. Co.* v. *Industrial Acc. Com.,* 27 Cal.2d 437 [164 P.2d 490]; *Van Horn* v. *Industrial Acc. Com.,* 219 Cal.App.2d 457 [33 Cal.Rptr. 169]; *Shell Oil Co.* v. *Industrial Acc. Com.,* 199 Cal.App.2d 426 [18 Cal.Rptr. 540].) ▪ As was stated in *Van Horn, supra,* at pages 466-467: "The theory of the compensation act as to death cases is that the dependents of the employee killed through some hazard of his employment shall be compensated for the loss of the support they were receiving from him at the time of his death. [Citation.] ▪ Where there is any reasonable doubt as to the jurisdiction, the courts must resolve such doubts in favor of jurisdiction of the commission."

With these principles in mind, we move to the record.

Petitioner first contends that there was insufficient evidence to support the commission's finding that decedent was, in fact, injured in the course of his employment on August 1, 1963. Viewing the evidence in the light most favorable to the applicants, as we must, the record shows the following: The widow testified that, a few days before leaving for a vacation in Canada on August 4, 1963, the decedent returned from work and, as she was talking to him as he undressed, she noticed on his right leg, about 4 inches below the knee and

a little to the left or right of the center of the shin bone, a vertical cut approximately an inch long, covered with congealed blood, with two little spots of blood below it, surrounded by a purple bruise and the whole area appeared red and inflamed. In answer to her inquiry, the decedent told her that he hurt his leg while on the job, but she was not sure whether he said he hurt it on the truck or on the corner of some crates; but it was one or the other. She suggested that it would be a good idea to let a doctor look at it and the decedent replied he would do so if it got any worse. She noticed blood on a pant leg; the decedent told her that it had bled quite a bit when he injured it.

Margaret McCubbin testified that the decedent took care of her lawn and garden. The last time the decedent cared for her yard before he left on vacation, which she thought was the first Friday in August, she noticed that he was limping. She testified: "I noticed when he put his equipment up on the sidewalk and walked toward me to speak to me he had a slight limp. And I asked him what was the matter. And he said, well, he hurt his leg. And I said, 'How did you hurt it, Danny?' And he said, 'Well, I banged in on the truck.' I said, 'On this truck?' And he said, 'No, on my truck at the plant.' "

The injured leg was the right one. On cross-examination Mrs. McCubbin testified that she asked whether the decedent had hurt his leg on his own pickup because she wanted to be sure he didn't bang it on the truck in front of her house. He told her "I banged it on the truck at the plant." She further testified that the last time the decedent mowed her lawn was on October 12th; that he complained of feeling ill; that, although it was an unusually hot day, he complained of freezing; that she told him he should go home and that he should see a doctor; and that he went home without completing the work; that he left the back yard undone.

The referee, at the request of both counsel and in their presence, inspected one of the petitioner's trucks which was represented to be the same as the one decedent used, and examined the crates contained in it. His view of the truck and crates constitutes independent evidence of anything that a visual inspection would disclose including the likelihood of decedent's having sustained the injury as alleged. (*Ethel D. Co.* v. *Industrial Acc. Com.*, 219 Cal. 699, 704-705 [28 P.2d 919]; *Otey* v. *Carmel Sanitary Dist.*, 219 Cal. 310, 312 [26 P.2d 308].)

Petitioner relies upon *G. L. Eastman Co.* v. *Industrial Acc.*

*Com.,* 186 Cal. 587, wherein the court stated at page 593 [200 P. 17]: "... there is no presumption ... that because an injury occurs in the course of the employment it arises out of or because of that employment." It also refers the court to section 3600 of the Labor Code, which provides conditions of compensation, as follows:

"(b) Where, at the time of the injury, the employee is performing service growing out of and incidental to his employment and is acting within the course of his employment.

"(c) Where the injury is proximately caused by the employment, either with or without negligence."

It is pointed out that there was no evidence presented in this case as to the circumstances under which decedent sustained the injury of August 1, 1963. That an injury occurs on the employer's premises from coming in contact with an instrumentality owned by the employer does not establish the injury arises out of the employment; nor does it establish that the employee was "performing service growing out of and incidental to his employment." Petitioner relies upon *Mello* v. *Industrial Acc. Com.,* 84 Cal.App. 233 [258 P. 104]. In *Mello* the commission had denied an application for death benefits. The circumstances of death were unexplained and the employee's reason for being at a part of the employer's premises where he drowned in a drain pool was unexplained. The court pointed out that the burden was upon the petitioners to show that the injury arose out of as well as in the course of employment. However, as the respondent commission points out, the *Mello* court conceded "that the evidence is sufficient to support a finding that the accident arose out of the employment" but deemed itself bound by the commission's contrary factual determination based upon sufficient evidence. Also in *G. L. Eastman Co.* v. *Industrial Acc. Com., supra,* 186 Cal. 587, relied upon by petitioner, the court said, at page 598: "... where two rational conclusions can fairly be drawn from the evidence, one sustaining and the other opposing the right to compensation, the conclusion adopted by the commission is beyond the scope of our review."

Petitioner next contends that the evidence was insufficient to establish that death was the proximate result of the August injury to the decedent's right leg.

It is the rule that: "It is the function of the commission, as the trier of the facts, to determine, as a fact, the proximate cause of the injury. Its finding in this regard, if supported by any evidence, cannot be disturbed by this court." (*Limited Mutual Compensation Ins. Co.* v. *Industrial Acc.*

*Com.*, 37 Cal.App.2d 50, 53 [98 P.2d 827]; *Pacific Emp. Ins. Co.* v. *Industrial Acc. Com.*, 92 Cal.App.2d 124, 126-127 [206 P.2d 372].)

In response to a hypothetical question outlining the facts as shown by the evidence, Dr. Bocian testified that he thought there was a direct connection between the death and the August injury. He opined that the death was caused by pulmonary embolization. He explained pulmonary embolism thusly: ''Now, an intravascular clot or thrombus forms in the vein of the extremities—Let's say the extremities—and part of it or the whole of it breaks off and starts to travel through the vena system and up into the pulmonary arteries and then comes to the lungs and may occlude, as it here happened. The thrombus when it travels becomes an embolus, occludes the various portions of the pulmonary tree, into the lungs, and thus obstructs the flow of blood. . . . Most often this will produce . . . sudden or instantaneous death. It is one of the few diseases that produces instantaneous death. Sometimes it doesn't have to be a large embolus obstructing the vessel. It can be a shower of emboli into the lung. As the pulmonary artery is not pictured here, but as the artery divides into smaller and smaller branches, as it goes up to the periphery, there may be tiny, little emboli occluding the smaller branches. And there are various ideas and theories as to how they kill. Sometimes just as easily probably, by the theory of overall spasms, or—overall spacement of the arterial tree in the lungs; and the patient dies from lack of oxygenation.''

He testified that emboli usually come from the lower extremities and there is usually a history of trauma. It takes a thrombus three or four days to organize, or form and propagate. It forms a tail. Usually on the fourth day, there is a breaking off of the tail on top of the thrombus, which is carried by the blood stream to the lungs. The doctor reasoned that the decedent had a predisposition to vascular involvement because his history showed that he wore an elastic stocking or ace bandage for several months after a leg injury which had occurred in 1958; and also because a small superficial vein which he dissected from the right leg was almost entirely occluded by an old organized thrombus. He did not go into the deep thigh veins. He testified that in his opinion the emboli came from the lower extremities. His underlying reasons were that the lower extremities are the most common origin of pulmonary embolization; that, although they sometimes come from the right side of the heart, he found nothing

in the heart which would indicate formation there; that certain diseases predispose to embolization, certain cancers, cancer of the pancreas, but there was no evidence of such diseases; that surgery around the pelvic organs will predispose to organization but there were no thrombi or vessel involvement in the pelvic organs.

Dr. Clell C. Gray, called by the petitioner, testified that he had been called in as a consultant on November 1, 1963. At that time the decedent was desperately ill, and his state of consciousness was not always clear; he was delirious part of the time. Although he was in disagreement as to the cause of death, and believed that the primary cause was a viral infection and a secondary cause was the thrombi in the lungs, he testified that it was possible that the August 1st injury caused a thrombus which formed a tail which subsequently broke off and lodged in the lung. He also agreed with Dr. Bocian's opinion that the thrombi in the lungs were from four to six weeks old; that old emboli tend to progagate to form new thrombi in the lungs. He testified that the autopsy finding of emboli and thrombi was unexpected; that the medical personnel treating the decedent did not suspect embolization; that decedent was never given anticoagulants; that he was treated with antibiotics without success, although blood tests and a sputum test were negative as to a finding of infection.

On this appeal, the petitioner attacks the testimony of Dr. Bocian on the basis that he was not a treating physician. It is argued that opinions of attending physicians are entitled to considerable weight as against the opinions of expert witnesses who have not attended the employee during his lifetime. Reliance is placed on *Blankenfeld* v. *Industrial Acc. Com.*, 36 Cal.App.2d 690 [98 P.2d 584], and *Winthrop* v. *Industrial Acc. Com.*, 213 Cal. 351 [2 P.2d 142]. In the last cited case the court stated at page 354: ". . . the physicians who attended petitioner . . . were in a better position to judge the length of time the condition had been developing than were those whose calculations were based upon related facts."

The commission points to a discussion of the *Winthrop* case contained in the later case of *Nielsen* v. *Industrial Acc. Com.*, 220 Cal. 118 [29 P.2d 852, 30 P.2d 995]. There the Supreme Court affirmed the commission's decision as supported by the opinion of a nontreating doctor "based on a written statement of the facts presented to him and on other reports and the testimony in the record," which contradicted the opinions of

treating physicians. At pages 122-123 of the opinion the court said: "There is no language in the *Winthrop* case, 213 Cal. 351 [2 P.2d 142], which should afford any foundation for a statement that the reviewing court had exceeded its powers in that case. There was no intent to hold, and it was not decided, that the opinion of experts who had no personal knowledge of the facts may not raise a conflict with the testimony and opinion of those whose conclusions are drawn from a personal examination of the injured employee. The opinion of experts based on hypothetical statements of the facts in the record is competent evidence. The weight of such evidence is for the commission's determination. Nor was it held in the *Winthrop* case that each statement or question upon which an opinion is asked must contain all of the facts appearing in the record."

Petitioner challenges the weight of Dr. Bocian's testimony. The weight of the evidence and credibility of witnesses are matters for the determination of the commission. (*Lockheed Aircraft Corp.* v. *Industrial Acc. Com.*, 28 Cal.2d 756, 761 [172 P.2d 1].) Further, the treating physicians obviously did not know what was wrong with decedent or why he died. It was not until after death and an autopsy was performed that the condition of the decedent's lungs and heart was known. Dr. Clell Gray, petitioner's witness, testified that this was a case where the diagnosis was tentative and the doctors were trying everything and nothing seemed to be successful.

Petitioner next complains that Dr. Bocian was not made aware of all the facts by the hypothetical question presented to him. It is argued that the doctor did not consider the testimony of decedent's coworkers that decedent had complained of "feeling pooped" in March or April of 1963, or the hospital records and the medical reports which indicated that decedent may have had shortness of breath for about a year prior to the death. ■ The hypothetical question need not contain all of the facts appearing in the record (*Nielsen* v. *Industrial Acc. Com., supra,* 220 Cal. 118, 123). ■ "It is not essential to the propriety of a hypothetical question that the facts assumed should be undisputed. The question is proper if it recites only facts within the possible or probable range of the evidence and if it is not unfair or misleading." (*Guardianship of Jacobson,* 30 Cal.2d 312, 324 [182 P.2d 537]; *People* v. *Wilson,* 25 Cal.2d 341, 349 [153 P.2d 720]; *Francis* v. *Sauve,* 222 Cal.App.2d 102, 120 [34 Cal.Rptr. 754].) ■ The truth or falsity of the purported facts upon which an expert bases his opinion is for the trier of fact to determine.

(*Treadwell* v. *Nickel*, 194 Cal. 243, 263-264 [228 P. 25].)
Further, a comparison of the hypothetical question which the
applicants' attorney posed to Dr. Bocian and the hypothetical
question which the petitioner's counsel posed to its witnesses,
Dr. Gray, Dr. Nobis, and Dr. Barr, shows they are almost
identical. None of the hypothetical questions embraces evi-
dence of complaints prior to August 1, 1963, except as shown
by the hospital records.

Petitioner states that Dr. Bocian did not hear the testimony
of the coemployees of the decedent which indicated that he
had complained of not feeling well as early as the spring
of 1963. Mr. Earl Brown testified that about six months prior
to the death, the decedent stated that he was "not feeling
well." Mr. Ben Flanagan testified that in March or April
of 1963 the decedent stated that he did not feel well, and that,
on several occasions prior to the vacation trip, the decedent
mentioned that he felt tired and was not feeling well. Mr.
Van Allen, the decedent's supervisor, testified that while the
weather was still cool, probably in March, the decedent said
that he was not feeling well and he was short of breath; that
he thought he might have lung cancer; and that he made a
number of complaints of not feeling well after the initial
complaint made about March.

Petitioner also points out that Dr. Hoffman's report shows
that the decedent was first interviewed and examined on
October 17, 1963. It states: "He gave a history of dyspnea
(difficulty in breathing) for one week which was constantly
associated with exercise. The exercise consisted of walking
from his milk truck to a house. For one year he has noticed
some shortness of breath intermittently associated with ex-
citement and worry. He now notices dyspnea when he walks
one block or when he climbs stairs or exercises mildly."

A consultation report of Dr. Eliason dated October 30,
1963, contains the following history: "Mr. McDannald is a
42 year old white milk-man who has always considered him-
self to be in good general health. . . . He noted the gradual
onset of dyspnea and wheezing on exertion, one year ago, but
did not think it necessarily abnormal until he developed
much more marked shortness of breath in the past 3 or 4
weeks."

Petitioner argues that Dr. Bocian was not aware the de-
cedent had complained of feeling "pooped" or tired or unwell
as early as the spring of 1963, or that he had based his opinion
upon an erroneous assumption of a continuing symptomatology

from shortly after August 1st until the date of death.

The commission argues that the facts allegedly ignored by Dr. Bocian, or unknown to him, have little or no support in the record. The hospital records merely indicate that the decedent, while suffering from his terminal illness, made some mention of difficulty of breathing having occurred occasionally prior to August 1, 1963, but that the severe breathing problems were of recent origin. It is pointed out that the testimony of the coemployees concerning isolated complaints of fatigue are meaningless. Petitioner's doctor, Richard Barr, testified that the complaints of feeling "pooped" were "not diagnostic of anything." Dr. Paul D. Nobis, also called by petitioner, stated there is a possibility that complaints of shortness of breath and feeling "pooped" could result from pulmonary embolism, but "these symptoms are very nonspecific." He felt it was very possible that a person engaged in two jobs might occasionally feel tired or pooped.

Further, the commission argues that the petitioner had the opportunity to cross-examine Dr. Bocian. It relies upon *Lumbermen's Mutual Casualty Co.* v. *Industrial Acc. Com.*, 29 Cal.2d 492 [175 P.2d 823]. There, the petitioner objected to the expert testimony on the ground that the expert had not given reasons for his opinion. The court held that the opinion was not for this reason stripped of its probative value, since "It goes to the weight of such evidence, a matter within the exclusive province of the commission as the arbiter of fact. Petitioners had the right to cross-examine the witnesses if they saw fit." (P. 500.) (See also *People* v. *Allen*, 212 Cal. App.2d 857, 861 [28 Cal.Rptr. 409].) Similarly, in the present case, if the petitioner deemed Dr. Bocian's opinion weakened by the fact that he failed to consider the decedent's springtime complaints, it had ample opportunity to cross-examine the doctor so as to test his opinion in the light of these complaints.

Petitioner points out that, on cross-examination, Dr. Bocian admitted that his opinion was "speculative in a sense." Of necessity every medical opinion must be in a sense speculative and this does not destroy the probative value of such an opinion. As was said in *Travelers Ins. Co.* v. *Industrial Acc. Com.*, 33 Cal.2d 685, 687 [203 P.2d 747]: "Candor and intellectual integrity often compel an honest physician to state that his diagnosis does not rest upon scientific certainty."

A case similar on its facts is *Santa* v. *Industrial Acc. Com.*,

175 Cal. 235 [165 P. 689], cited by the commission. There the employee sustained a fracture of his pelvic bone in an industrial accident which occurred on October 30; he was hospitalized, placed in a plaster cast and confined to a hospital bed. Apparently making satisfactory progress, he suddenly died on November 14. The expert pathologist in that case opined that the cause of his death was embolism precipitated in part by the pelvic fracture. The treating physician was of the opinion there was no causal connection between his injury and death. At page 237, the Supreme Court said: "It is true that, on cross-examination, Dr. Ophuls said he could not state that, in fact, there had been an embolus, and that his explanation of the cause of death was 'guesswork.' But a reading of his entire testimony shows that he did not, by this, mean to say that he was indulging in mere conjecture or speculation. He was giving what, on the facts before him, and in the light of medical science, appeared to be the most probable explanation of the event. The theory that an embolus arising from the injury had caused the death was 'guesswork' only in the sense that there was no direct evidence of the existence of such embolus. But, in Dr. Ophuls' view, other conceivable causes were excluded by the conditions which were shown, and the one which he advanced remained as the most probable one. This was a sufficient basis for the action of the commission. Absolute proof or mathematical demonstration is not required. (Code Civ.Proc., § 1826.) The commission is the final judge of the facts, and its findings cannot be overturned where they have the support of evidence upon which a reasonable man could come to the conclusion which was reached. There is such evidence here."

The commission argues that the same must be said of the instant case, where "the nature of the injury, the facts and circumstances surrounding the same, and the symptoms which followed made it impossible to demonstrate, beyond the possibility of a doubt, the exact cause . . ." (*Royal Indemnity Co.* v. *Industrial Acc. Com.,* 70 Cal.App. 435, 436 [233 P. 381]) of the decedent's death.

Although the testimony of petitioner's three doctors may well have supported a finding contrary to that of the commission, the most that can be said is that there was a conflict in the medical evidence which was finally and conclusively resolved against petitioner. (*Foster* v. *Industrial Acc. Com.,* 136 Cal.App.2d 812, 815 [289 P.2d 253].)

In *Gimbel* v. *Laramie,* 181 Cal.App.2d 77, at pages 79-80

[5 Cal.Rptr. 88], the court stated: "Appellant first urges that there is no evidence to support the court's finding that he did not suffer a myocardial infarction. He cites the record of his injuries, the electrocardiograms, the results of other examinations made by his doctor, together with the hospital records as conclusive evidence of a heart injury. Yet, the respondent's medical expert testified in regard to the same evidence which appellant has pieced together and arrived at a different conclusion. Counsel for appellant cross-examined respondent's doctor in some detail as to his interpretation of the evidence and his opinion deduced therefrom. The court simply found the testimony of respondent's doctor to be more reasonable than that of the doctors produced by appellant. Since respondent's doctor based his expert testimony upon evidence before the court, it cannot be said that the record does not support the court's finding. Cases holding that an appellate court will not attempt to re-weigh the evidence or determine the credibility of witnesses are legion [citation]. The testimony of a medical witness in answer to hypothetical questions based on the facts in the record is sufficient to support a finding contrary to the testimony of other medical witnesses who have seen and examined the patient. [Citations.] The testimony of one credible witness, if believed, is sufficient to support a finding of the court.''

██ Petitioner complains that Dr. Bocian dissected and examined only a superficial vein from the right leg and did not dissect or examine the deep veins, i.e., the femoral and popliteal veins, which carry 90 per cent of the blood and through which emboli would be carried to the lungs. First, the complaint goes to the weight to be given to the autopsy findings and Dr. Bocian's testimony based thereon. That is a matter for the commission—not this court. Secondly, the record discloses that the petitioner's medical experts did not place a great deal of weight on the failure to examine the deep veins. Dr. Richard Barr, produced by petitioner, testified that if the deep veins had been examined—''I think more information could have been gained. I don't think, necessarily, you would have found the answer to the questions we are here for today. Because in trying to find—In dissecting out vessels in the leg—And I am not a pathologist but at least I have had pathology training through my years—it's very hard to find—identify and examine all the vessels and there are changes after death. Even when post mortem is done soon after it makes interpretation difficult as to when did this occur, how

recent is it. So even if a very extensive pathology report had been done, I don't know that it would have necessarily given us any final, definite answer. But it would have contributed more than the one that is available.''

Dr. Clell C. Gray, also a witness for petitioner, testified as follows: ''Q. Then we get into the same kind of problem that we have when a thrombus breaks off from the lower extremity. It may leave no trace that you can find on examination. A. True, true. Or it takes the most meticulous dissection of the extremity to find any evidence of it.''

Dr. Bocian also testified that ''many times, if you open up, you don't find anything.'' He also testified:

''Q. Doctor, after a thrombus breaks off and the embolization into the lungs causing death, is there any evidence of that left in the vein? A. Sometimes the root of the thrombus that started might be there, or none at all. It may break off.

''Q. So that it could be there, would be, there is no evidence; and it could be there would not be any evidence. A. That's right.''

The petitioner next complains that the evidence is insufficient to sustain the award of reimbursement for the expenses of self-procured medical treatment. It is argued that an employee is not entitled to costs of self-procured medical treatment prior to the time that he notifies his employer of the claimed industrial injury. (*Columbia-Geneva Steel Division* v. *Industrial Acc. Com.*, 115 Cal.App.2d 862 [253 P.2d 45].) In this case the employer was accorded no opportunity to provide any medical treatment and in fact, was not put on notice of the claim of injury until almost one year following the injury. Petitioner relies upon *Pacific Indemnity Co.* v. *Industrial Acc. Com.*, 220 Cal.App.2d 327 [33 Cal.Rptr. 649], for the proposition that one of the conditions for the right of entitlement to self-procured treatment was whether the treatment was successful. In that case, it was said at page 333: ''One of the tests announced in those cases, to establish Pacific's liability for her self-procured medical treatment, is that the treatment received from the applicant's own physician was a success, and that it was reasonably and seasonably necessary. In this connection, there is a total lack of such showing. In fact, the commission concedes that the applicant has not been successfully relieved from her complaints.'' Here, petitioner points out, the self-procured treatment was unsuccessful and the patient died.

The discussion of the court in *Pacific Indemnity Company*

was made in the light of an entirely different factual situation. There, an award of continuing medical treatment had been made and the carrier advised the applicant to see the carrier's doctor if she needed medical care. She advised the carrier that she did not want to be treated by the particular doctor because of adverse testimony he had given at the hearing. The carrier advised her by letter of the names of three physicians and specifically stated that it would not be liable for any medical treatment rendered to her except by one of the three named doctors. Without further notice to the carrier, the applicant consulted her own doctor. A subsequent award for her self-procured medical treatment was made by the commission and annulled by the reviewing court. In so doing, the court distinguished cases where awards of reimbursement had been upheld on the ground that the particular applicant's condition had been improperly diagnosed by the carrier's physicians or medical treatment had been denied by the carrier. In such case the applicant's successful self-procured medical treatment established that the diagnosis of the carrier's physicians was incorrect and amounted to a refusal on the part of the carrier to render medical treatment. Success of self-procured medical treatment is merely a factor in establishing a carrier's refusal to provide adequate medical treatment.

In the *Columbia-Geneva Steel* case, *supra,* 115 Cal.App.2d 862, there was an unexcused failure on the part of the applicant to notify the carrier of the injury. It was held that the employer was not liable for self-procured medical treatment since it had no opportunity to render such treatment on account of the employee's unexcused failure to notify it.

In the present case, the commission found that the "employee neither knew nor had reason to know the need (for medical treatment) was caused by the injury." The finding is supported by the evidence since the treating doctors could not even diagnose what decedent was suffering from, and thus certainly could not connect his medical problem to the August injury. It was not until after death and the autopsy was made that it was known the pulmonary embolism which Dr. Bocian found to have caused the decedent's death could be attributed to the August injury.

The courts and the commission have allowed the employee reimbursement for the reasonable expense of self-procured medical treatment, where the employee does not know or have reason to know that his condition is industrially caused.

In *Simien* v. *Industrial Acc. Com.*, 138 Cal.App.2d 397, at page 401 [291 P.2d 951], it was held that Labor Code section 4600 imposes the primary duty upon the employer to furnish all medical treatment reasonably required to cure or relieve the employee from the effects of an industrial injury, which duty is not to be relieved except for good cause. The court noted the duty is suspended where the employee fails to notify the carrier of his injury. Thus, if the employee has some knowledge that the injury is employment-connected, he forfeits his right to reimbursement. However, "if for any cause he had no such knowledge it would manifestly be unreasonable and unjust to require him to give notice which was impossible for him to give." (See also *Department of Employment* v. *Industrial Acc. Com.*, 227 Cal.App.2d 532, 540 [38 Cal.Rptr. 739] ; *Pacific Emp. Ins. Co.* v. *Industrial Acc. Com.*, 5 Cal.Comp.Cases 82 (writ denied) ; *Wofford* v. *Coast Wise Marine Co.*, 11 Cal.Comp.Cases 114; *Mel Lewis Ford* v. *Industrial Acc. Com.*, 29 Cal.Comp.Cases 146 (writ denied) ; *California Compensation & Fire Co.* v. *Industrial Acc. Com.*, 28 Cal.Comp.Cases 87 (writ denied) ; *Pacific Emp. Ins. Co.* v. *Industrial Acc. Com.*, 25 Cal.Comp.Cases 237 (writ denied).)

The test of when an employer may be held liable for self-procured medical help cannot be frozen into one interpretation of a single sentence contained in the opinion in *Pacific Indemnity Co.* v. *Industrial Acc. Com.*, *supra*, 220 Cal.App.2d 327. To read that sentence into a mechanistic formula that liability can never attach to an employer unless the medical assistance procured by the employee is successful is to say that an employer may wrongfully deny medical treatment to an injured employee, thus shifting to the employee the burden of bearing his own medical expenses without hope of reimbursement from the employer, unless the self-procured treatment is deemed to be successful. Such a situation would be intolerable and contrary to the purposes of the compensation act.

Petitioner lastly contends that the commission exceeded its jurisdiction in awarding reimbursement for medical expenses paid by Occidental Insurance Company and imposing a lien in the amount of $709.10. It is pointed out that the premiums for this policy were paid by petitioner in its capacity as the employer. Occidental did not file a lien in the case and was not a party to the case. The only showing made, petitioner argues, is testimony that Mrs. McDannald had paid a portion of the medical bills and that Occidental had paid a portion.

The bills were submitted showing a notation of payment by Occidental of $709.10. Petitioner argues that no claim was made by Occidental, no lien was filed on its behalf, and there was no showing that it was entitled to reimbursement from its own assured. Petitioner submits that it was entitled to be afforded with notice of the claim and an opportunity to present a defense thereto; it was entitled to its day in court. It is further argued that the employer, through its policy of insurance with Occidental reimbursed Mrs. McDannald for the major part of the medical expense. Since Labor Code section 4600 provides that the employer is liable for the expense of medical treatment only in "the case of his neglect or refusal seasonably to do so" and since the employer through its insurance carrier did provide for payments of a portion of the medical treatment no award could be made for that portion to the employee and accordingly no lien allowed against any unpaid compensation. It further argues that no issue was ever framed as to the lien claim of Occidental; petitioner was never apprised that the lien claim of Occidental was to be determined. It was never accorded an opportunity to present evidence to meet the claim.

The commission points out that it was established in the record by the testimony of the widow and by exhibits that Occidental Insurance Company paid $709.10 of the medical bills for the last illness of the decedent. The reasonableness of the charges, the fact that they were incurred and the fact that they were paid by Occidental is not challenged.

The commission points out that it may allow a lien without the technical filing of a formal lien claim, under the authority of Labor Code section 4905, which provides: "Where it appears in any proceeding pending before the commission that a lien should be allowed if it had been duly requested by the party entitled thereto, the commission may, without any request for such lien having been made, order the payment of the claim to be made directly to the person entitled, in the same manner and with the same effect as though the lien had been regularly requested, and the award to such person shall constitute a lien against unpaid compensation due at the time of service of the award."

That the policy in question covered only nonindustrial injuries not covered by workmen's compensation insurance was brought out by petitioner in the testimony of its supervisor, Mr. Van Allen, on direct examination, as follows:

"Q. Incidentally, is there an insurance plan at work for

non-industrial injuries—injuries not on the job? A. Yes. The union pays $24.75 a month for each man and his family to have access to medical care.

"Q. Does Foremost contribute anything to that? A. They pay the whole fee. That's part of our fringe benefits.

"Q. The insurance with Occidental is paid for by the Company? A. The insurance with Occidental is paid for by the Company.

"Q. This covers non-industrial or off the job injury, is that correct? A. Correct.

"Q. Did you process Mrs. McDannald's claim to Occidental or was this handled through the union? A. What claim is that?

"Q. The claim for the hospital bill. A. It was handled through the union. . . ."

In *Department of Employment* v. *Industrial Acc. Com.*, *supra*, 227 Cal.App.2d 532, at pages 539-540, in discussing the case of *Gerson* v. *Industrial Acc. Com.*, 188 Cal.App.2d 735 [11 Cal.Rptr. 1], the court said: "The essence of the holding in *Gerson* is that the commission may allow, as a lien against an award pursuant to Labor Code section 4903, subdivision (b), the reasonable expenses incurred for or on behalf of an injured employee in obtaining 'medical and hospital' treatment for an industrial injury by one who is obligated to furnish such treatment for a nonindustrial disability only, where such expenses have been assumed under the mistaken belief that the disability was nonindustrial."

The medical insurer having paid under a mistake of fact at a time when it was not determined whether or not decedent's condition was industrially caused, was entitled to a lien for the medical benefits it furnished.

The record discloses that the policy was provided by the employer as a fringe benefit to the employee and as such formed a portion of the wages paid to decedent as an employee. Thus, in effect, the employee paid the premiums. The result is the same whether the employer paid the premiums as an employment benefit to the employee or whether he paid the employee direct and the employee procured his own private medical insurance. Mr. Van Allen testified that the insurance was handled through the union as a "fringe benefit" for the employees. In *Palaske* v. *City of Long Beach*, 93 Cal.App.2d 120, at page 127 [208 P.2d 764], it is said: ". . . the word 'benefit' is a generic term which includes all contractual rewards which the employer owes to the employee through estab-

lished rule and practice. In *MacLaughlin* v. *Union Switch & Signal Co.*, 166 F.2d 46, 48, the question involved was one of vacation rights. The court there said, in part: '. . . Vacation advantages accorded employees are certainly no less to be prized than such *benefits* as *pensions,* bonuses and participation in insurance programs. . . .' (Emphasis added.)''

Section 227 of the Labor Code makes it a misdemeanor for an employer to fail wilfully to make payments to a health and welfare fund called for by his collective bargaining agreement with the employees' union. In construing that section the court, in *People* v. *Alves,* 155 Cal.App.2d Supp. 870, at page 872 [320 P.2d 623], had this to say: ''There is no doubt that payments to a health or welfare fund made as part of the compensation for services rendered by employees are wages as that word is used in the foregoing quotation. Labor Code, section 200, provides as follows: 'As used in this article: (a) ''Wages'' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation. (b) ''Labor'' includes labor, work, or service whether rendered or performed under contract, subcontract, partnership, station plan, or other agreement if the labor to be paid for is performed personally by the person demanding payment.' ''

Thus, the payment of premiums by the petitioner pursuant to its collective bargaining agreement with the union, is wages within the meaning of its agreement of employment with the decedent, and should not be construed to be medical treatment rendered for which the petitioner, as its own compensation carrier, is entitled to credit against an award.

The petitioner is not aggrieved by the imposition of a lien in favor of Occidental, nor is it prejudiced thereby, and it should not be heard to complain. If the widow was entitled to self-procured medical expense, as we have determined that she was, it is immaterial to the petitioner whether it makes reimbursement to her or to Occidental.

The order is affirmed.

Stone, acting P. J., concurred.